## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ANTHONY DiPIPPO,<br><br>     Plaintiff,<br><br>v.<br><br>COUNTY OF PUTNAM; Putnam County Sheriff's Department Sheriffs ROBERT THOUBBORON in his individual capacity; Putnam County Sheriff's Department Investigators DAN STEPHENS, PATRICK CASTALDO, BILL QUICK, and Putnam County Sheriff's Department Officer VICTOR NESTOR, in their individual capacities,<br><br>     Defendants. | **Case No. 17-cv-7948**<br><br><br>**COMPLAINT AND JURY DEMAND** |

Plaintiff ANTHONY DiPIPPO, by his attorneys the law firms of Neufeld Scheck & Brustin, LLP and Brafman & Associates, P.C., hereby alleges as follows:

### INTRODUCTION

1.     Plaintiff Anthony DiPippo spent nearly 20 years in prison for a horrendous crime that he did not commit—the rape and murder of 12-year-old Josette Wright.

2.     For most of that time, the actual perpetrator, serial rapist and murderer Howard Gombert, remained at large, continuing to rape other women and young girls.

3.     DiPippo's conviction was the result of serious investigative misconduct orchestrated and carried out by Putnam County Investigator Dan Stephens. In 2014, a federal jury awarded $42,650,000, the largest wrongful conviction jury award in U.S. history, solely against Defendant Stephens, in a case brought by Jeffrey Deskovic, another teenager whose wrongful conviction Stephens caused in the years prior to this case.

1

4.      Here, as in Deskovic, and consistent with Stephens's practice, Stephens and his subordinates used unlawful coercion and sham polygraphs to wear subjects down, fed non-public details to make false statements appear reliable, and misrepresented that the details had originated with the subject, not the police. Here, as in Deskovic, and consistent with Stephens's practice, Stephens and his subordinates manipulated vulnerable teenagers into adopting false inculpatory statements instead of properly investigating the case. And here, as in Deskovic, the lone adult sexual predator actually responsible for the child's rape and murder went on to rape more women and girls.

5.      Stephens and his subordinates, Putnam County investigators Castaldo and Quick, based their theory of the case on an obviously unreliable statement from Dominick Neglia, a friend of DiPippo's, which they obtained after months of using coercion, suggestion, and improper incentives to wear Neglia down. Neglia recanted and refused to testify against DiPippo at trial. But by then, using the same improper tactics, Defendants had induced four other vulnerable teenagers and young adults—all of whom used drugs and had been in trouble with the law—to adopt statements corroborating Defendants' theory.

6.      Each of those individuals has recanted and stated they adopted false statements provided by the police under threat of prosecution, physical violence, or both. Only one, Denise Rose— who has given multiple conflicting statements, and who in 2015 admitted to the then-District Attorney and an Assistant Attorney General reinvestigating the case that her statement incriminating DiPippo was false and completely manufactured by the police—stood by her false story at the 2016 retrial that resulted in DiPippo's acquittal.

7.    To make Rose's false statement appear reliable at trial, defendants fed her non-public details about the way the crime occurred, and misrepresented that those details originated with Rose, when in fact they were supplied by the police.

8.    Defendants also misrepresented that police had found jewelry belonging to the victim in the van they maintained DiPippo and his accomplice used to commit the murder. In fact, the van was on cinderblocks and not even functional during the time period in which Wright was murdered.

9.    Finally, Defendants used improper suggestion to get other witnesses to change their accounts of when Wright disappeared to comport with Defendants' timeline.

10.    Defendant police officers acted with the direct participation, knowledge, and acquiescence of supervisors and policymakers in Putnam County, and pursuant to its policies, customs, or patterns and practices.

11.    For 20 years, Anthony DiPippo and his family protested his innocence and maintained the belief that one day the truth would free him.

12.    Appellate courts overturned Anthony DiPippo's conviction twice, but Defendants doubled down on their false and misleading reports to the prosecution, causing prosecutors to pursue convictions against Anthony DiPippo in three separate criminal trials, in 1997, 2012, and 2016.

13.    On October 11, 2016, a jury acquitted him, and Anthony DiPippo finally won his freedom. He was 20 years old when he was imprisoned for Wright's rape and murder, and 40 at the time of his release. DiPippo now seeks accountability, redress for the misconduct that cost him his youth, and a public record to help protect others from wrongful conviction.

## JURISDICTION AND VENUE

14.     This action is brought pursuant to 42 U.S.C. §1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution.

15.     This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

16.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

17.     Venue is proper in the Southern District of New York under 28 U.S.C. § 1391(b) in that this is the District in which the claims arose, in which DiPippo currently resides, and in which Defendants conduct their business.

18.     Plaintiff has complied with the requirements of New York City General Municipal Law § 50-i. DiPippo made and served a notice of claim on all municipal defendants, within the time required by New York General Municipal Law § 50-e. More than 30 days have elapsed since the service of those notices, and no offer of settlement has been made.

19.      DiPippo submitted to a hearing pursuant to New York General Municipal Law § 50-h.

## JURY DEMAND

20.     Plaintiff requests a trial by jury on all issues and claims set forth in this Complaint, pursuant to the Seventh Amendment of the United States Constitution and Federal Rule of Civil Procedure 38(b).

## PARTIES

21.     Plaintiff **ANTHONY DiPIPPO** is a resident of Dutchess County in the State of New York, and at all times relevant to this complaint, was a resident of Dutchess County or Putnam County in the State of New York. Anthony DiPippo did not rape and murder Josette Wright. Nonetheless, on July 11, 1997, Anthony DiPippo was wrongfully convicted of her rape and

4

murder. After nearly two decades in prison, DiPippo was finally released on October 11, 2016, after the New York State Court of Appeals vacated his conviction and a jury acquitted him.

22.     Defendant **COUNTY OF PUTNAM**, New York, is and was at all times relevant to this complaint responsible for the policies, practices, and customs of the Putnam County Sheriff's Department ("PCSD"). The PCSD along with New York State Police provide primary law enforcement services for the County of Putnam, except for the towns of Carmel and Kent and the villages of Brewster and Cold Spring, which have their own police departments. For the times relevant to this complaint, the PCSD has employed policies, practices, and customs that regularly violated civil rights. In 2000, as citizen complaints skyrocketed, Governor George E. Pataki called for a state investigation and the Legislature voted unanimously to authorize an independent state investigation of the PCSD due to the growing number of allegations that the department had abused its power and violated civil rights.

23.     Defendant **DAN STEPHENS** was a duly appointed and acting investigator of the PCSD, acting under color of law pursuant to statutes, ordinances, regulations, policies, customs, and usage of Putnam County and the State of New York. For the times relevant to this complaint until 2000, Defendant Stephens was supervisor for the Bureau of Criminal Investigation and oversaw the investigation into the rape and murder of Josette Wright. He now works as Putnam County Coroner. Defendant Stephens supervised and directly participated in the investigation by, including but not limited to, interrogating suspected witnesses and administering coercive polygraph tests to Adam Wilson and Andy Krivak. In October 2014, a jury awarded $42,650,000 to Jeffrey Deskovic, who adopted a false confession to a rape and murder he did not commit after Defendant Stephens conducted a coercive polygraph exam. Stephens is sued in his individual capacity.

24.     Defendant **PATRICK CASTALDO**, at all times relevant to this complaint, was an officer with the Putnam County Sherriff's Department acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of Putnam County and the State of New York. As one of the lead investigators on Josette Wright's case, it was Defendant Castaldo's practice to coerce confessions from supposed witnesses, threaten and manipulate supposed witnesses, fabricate inculpatory evidence, and conceal exculpatory information to secure a conviction. Defendant Castaldo retired from the PCSD in 2014. In February 2015, Defendant Castaldo was indicted on a felony charge in an unrelated case after he failed to disclose his use of force on a person in his custody the previous year. This assault, which occurred inside the courthouse at Carmel Town Hall, was caught on videotape. In February 2017, Defendant Castaldo pled guilty to harassment in the second degree. He is sued in his individual capacity.

25.     Defendant **BILL QUICK** was, at all times relevant to this complaint, an officer with the PCSD acting under color of law pursuant to statutes, ordinances, regulations, policies, customs, and usage of Putnam County and the State of New York. Along with Defendant Castaldo, he was a co-lead officer in the Josette Wright investigation, and it was his practice to coerce confessions from supposed witnesses, threaten and manipulate supposed witnesses, fabricate inculpatory evidence, and conceal exculpatory information to secure a conviction. He is sued in his individual capacity.

26.     Defendant **VICTOR NESTOR** was, at all times relevant to this complaint, a PCSD correction officer acting under color of law. He conspired with Castaldo and Quick to give false evidence regarding an admission DiPippo purportedly made during his pretrial detention. (DiPippo never made such an admission.) He is sued in his individual capacity.

27.     Defendant former **SHERIFF ROBERT D. THOUBBORON** led PCSD for 16 years, from 1986 to 2001, with an unapologetically forceful style. Sheriff Thoubboron was intimately acquainted with the policies, practices and customs at PCSD. He was its final policymaker from 1986 to 2001, including during the Josette Wright investigation and Anthony DiPippo's first trial 1997. Sheriff Thoubboron was defeated in the 2001 election after a state commission concluded that he had abused his office by using it to punish his political enemies. He is sued in his individual capacity.

## FACTUAL ALLEGATIONS

**Twelve-year-old Josette Wright Disappears.**

28.     On October 4, 1994, Josette Wright's mother reported to the police that 12-year-old Josette, a seventh grader at George Fischer Middle School in Carmel, New York, had been missing since the previous day, October 3, 1994.

29.     The disappearance was big news in Putnam County. Josette's mother spread the word and enlisted help hanging up posters with images of the missing blond-haired, blue-eyed preteen.

30.     Shortly after Wright's disappearance, a neighbor told police that she saw Wright on October 3, 1994, when she was driving home from work. The neighbor reported that Wright was standing at the intersection when a red car with Connecticut license plates stopped next to her; Wright spoke to the driver, a man, and then climbed into the passenger seat beside him.

31.     Over a year later, on November 22, 1995, a local deer hunter found Josette Wright's skeletal remains in Patterson, NY, in the wooded area of Fields Lane.

32.     Wright's body had decomposed such that the date of her death was indeterminable. She was prone, face-down, on the forest floor. Twigs and forest debris covered her exposed skeleton. Based on subsequent forensic analysis, it was determined that a rope bound Wright's

hands behind her back and circled her neck and one of her legs. The bones in her right foot were broken. Wright's underwear was stuffed in her throat, and her bra was tied around her face.

33.     PCSD officers found Wright's weather-beaten white sneakers, brown jacket, and white t-shirt at the scene, as well as 35 cents, a pink Bic lighter, remnants of a photograph and a blue hologram pendant.

**Howard Gombert killed Josette Wright.**

34.     The police never found the man in the red car with Connecticut plates, but the evidence indicates that it was serial rapist Howard Gombert, who frequently drove his girlfriend's red car with Connecticut plates.

35.     Gombert raped or murdered at least five other children using the same brutal methods that were used on Wright:

- Gombert repeatedly raped C.C. over a two-and-a-half-year period, starting in 1979 or 1980, when she was 12 years old. Gombert would threaten C.C. at knifepoint, take her to the woods, bind her arms behind her back with rope, and stuff underwear in her mouth before raping her—just as he did with Wright. He warned C.C. that he would murder her if she ever told anybody. After he was convicted of statutory rape—and sentenced to nine months incarceration—he sent C.C. threatening letters from prison.

- In June 1994, Gombert raped his child's former babysitter, 17-year-old, blond-haired, blue-eyed A.F. after binding her hands behind her back and stuffing underwear in her mouth—just as he had done with Wright. Although A.F. reported her rape to the Kent Police Department, Gombert was never prosecuted.

- In April 1995, Gombert caused the disappearance of R.M., the 17-year-old confidant of his ex-girlfriend Stephanie Conway. Conway had fled Gombert to a battered women's shelter because she thought he was trying to kill her. Gombert admitted that he visited R.M. on the day she disappeared to persuade her to ask Conway to take him back; a letter from Gombert was found in R.M.'s abandoned pocketbook. R.M. was never seen again, and Gombert attempted suicide. Years later, R.M.'s underwear was found inside a suitcase in a house where Gombert was residing; her body has never been found.

- Gombert repeatedly raped another girlfriend's daughter, E.W., starting when she was 8 years old. E.W. claimed that for years, Gombert would take her to Fields Lane or other wooded areas, tie her hands behind her back, stuff underwear in her mouth, and rape her. E.W.'s mother also reported that Howard Gombert raped and sodomized her while her hands were tied and threatened to kill her if she complained.

- In 1999, four years after Wright's body was found, Howard Gombert isolated a blond-haired, blue-eyed 8-year-old girl, S.L., in a wooded area, held her hands behind her back, shoved underwear in her mouth, sexually assaulted her, and threatened to murder her. Justice finally prevailed, and Gombert was convicted of this crime.

36.    Before Josette Wright disappeared, Gombert had asked her to babysit for him as a replacement for the babysitter who had quit after he raped her. Gombert met Wright through a former girlfriend whom Wright admired as a mother figure, and Gombert had been seen in Wright's company at his former girlfriend's home. Gombert also told the former girlfriend that he would get Wright to babysit for his daughter.

37.    While incarcerated after his conviction for raping an 8-year-old girl, Gombert confessed to a fellow inmate, Joseph Santoro, who reported that Gombert bragged to him about raping Wright around the time she disappeared. Gombert told Santoro said that he was "in the clear" for Wright's murder because "some other suckers" had already been convicted for the crime. Gombert also mentioned a girl named Robin, claiming that her body would never be found.

38.    Howard Gombert is currently serving a 30-year sentence for child rape. *See State v. Gombert*, 863 A.2d 437 (Ct. App. 2003).

9

**Defendants, under pressure to solve the crime, pin it on local hooligans DiPippo and Krivak.**

39.     Wright's murder shocked the safe community of Putnam County, which prided itself on having among the lowest crime rates in the nation. The murder attracted significant public attention in the following weeks and months.

40.     Then-Sheriff, Defendant Thoubboron, wanted to reassure the public by solving the case before his next election. Thoubboron placed then-Supervisor of the Bureau of Crime Investigations, Defendant Stephens, in charge of staffing the investigation and solving the crime. Thoubboron knew that Stephens would secure a quick conviction to quell anxiety and reassure the public, even if he had to use coercive and unlawful tactics to do so.

41.     Stephens had a reputation in Putnam County for being able to coax a confession out of anybody. He had conducted hundreds of interrogations and knew the physical, psychological, and emotional pressure points that would cause suspects to confess—regardless of their guilt.

42.     Stephens turned to investigators Defendants Castaldo and Quick to do the groundwork on the case. Castaldo and Quick were more than willing to adopt Stephens's approach to investigation—to obtain a conviction without regard to the truth or the constitutional rights of the suspect.

43.     Plaintiff Anthony DiPippo was known to police as a local teenaged troublemaker.

44.     Three days after the discovery of Wright's remains, police pulled over DiPippo and his friends Andy Krivak and Dominick Neglia, searched their car, and found drugs. DiPippo, 18, Krivak, 17, and Neglia, 16, were arrested.

45.     Shortly before police pulled them over, the boys were discussing the discovery of Wright's remains three days earlier, their shock over her murder, and the fact that DiPippo and Krivak had known her.

46.     Upon police questioning, Neglia, who was scared and wanted to go home, gave a general statement indicating that DiPippo and Krivak knew something about the Wright murder.

47.     In exchange for the false tip, Dominick Neglia was released from jail that evening despite the pending charges. DiPippo and Krivak were not.

48.     Upon information and belief, Defendant Stephens advised Defendants Castaldo and Quick that they should get Dominick Neglia to obtain a confession from Anthony DiPippo.

49.      For weeks, Castaldo and Quick pressured, threatened, and cajoled Neglia to develop evidence against DiPippo. They pulled him from classes for interrogation so often that his high school principal asked them to stop, and showed up so often at his job that he was fired.

50.      Because of this harassment, Neglia finally told Castaldo and Quick what they wanted to hear: that DiPippo had confessed to raping and murdering Wright. Neglia fabricated a story that DiPippo had told him that he, Krivak, and other friends had picked Wright up in DiPippo's Bronco on their way home from a party and raped and murdered her.

51.     Subsequently, Neglia went to the PCSD station and told Castaldo and Quick that he no longer wanted to be involved in their investigation.

52.     In response, Defendant Castaldo hit Neglia in the back of the head with a pair of handcuffs and told him that he "didn't have any other choice." Defendant Quick joined in, telling Neglia that he and Defendant Castaldo had both just witnessed Neglia fall out of his chair and hit his own head.

53.     Stephens, Castaldo, and Quick wanted more and better evidence implicating DiPippo.

54.     Terrified of further physical violence, Neglia agreed to participate in a ruse designed to elicit a more detailed false incriminatory statement from DiPippo. Defendant Quick gave Neglia money and instructions to buy DiPippo drugs, get him high, and get him talking.

55.     Neglia plied DiPippo with drugs, but DiPippo never implicated himself in the murder—because he was innocent.

56.     Approximately two weeks later, Neglia falsely asserted that DiPippo, Krivak, their friends Adam Wilson, Bill MacGregor, and a woman named "Patty" were driving Wright home from a party when DiPippo or Krivak had raped and murdered her.

57.     In a 1997 sworn recantation, Neglia retracted his earlier statement and admitted that the entire story was fabricated. He stated that he believed the story would "blow over" and never thought that DiPippo and Krivak would be prosecuted for Wright's rape and murder.

58.     Neglia did not testify against DiPippo or Krivak in the 1997 trial, the 2012 trial or the 2016 trial**.** He testified for the defense at DiPippo's 2012 pretrial hearing, but pleaded the Fifth Amendment at trial because Defendants had threatened to prosecute him for perjury. At DiPippo's 2016 retrial, he testified that his statements were false and described the Defendants' misconduct.

59.     Dominick Neglia told Defendant Castaldo and Quick and other officers in the PCSD that his initial police statements were false and that Anthony DiPippo had never confessed to him, but Defendants misrepresented Neglia's statements in writing and failed to document or disclose his recantations.

**Police focus on Andy Krivak's van.**

60.     Among other obviously unreliable details in Neglia's fabricated story, he had told police that Wright was abducted in DiPippo's Bronco. Castaldo and Quick subsequently learned that DiPippo did not own a Bronco in 1994 and did not even have a driver's license. So, Defendants determined that if the crime occurred in a car, it would have to be a different car.

61.     Castaldo and Quick settled on the brown van driven by DiPippo's purported accomplice Krivak, which was conveniently already in PCSD custody, impounded following Krivak's drug arrest. Police conducted a thorough inventory search at the time the van was impounded and collected numerous items, including paper, food, garbage, and two women's rings between the front seats.

62.     Approximately two months after Wright's remains were found, Detective John Daniel Rees conducted a "second inventory search" of Krivak's van at Castaldo's direction. Following this search, Detective Rees reported finding a lizard earring and cat's eye ring that had somehow been missed during the first inventory search.

63.     Wright's mother said that the lizard earring and the cat's eye ring had belonged to Wright. These two pieces of jewelry became key evidence supposedly linking DiPippo to Wright's murder. Defendant Castaldo vouchered the jewelry, which was later introduced as an exhibit at trial.

64.     Either Defendants planted Wright's jewelry in Krivak's van, or the jewelry never belonged to Wright at all, but Stephens, Castaldo, and Quick manipulated witnesses into reporting that it had.

**Stephens, Castaldo, and Quick coerce Denise Rose into giving a fabricated statement inculpating DiPippo.**

65.     Stephens, Castaldo, and Quick knew that Neglia's incredible statement would not be enough to convict DiPippo. So, they coerced DiPippo's close friend Denise Rose—a susceptible, 19-year-old with substance abuse problems—into giving false statements claiming that she had been in Krivak's van on October 3, 1994, and had seen DiPippo and Krivak rape and murder Wright. Rose's statements matched their theory of the case precisely because they fed it to her.

13

66.    One of the names Dominick Neglia provided the police under duress was "Patty."

Defendant Castaldo later misrepresented that when he asked Dominick Neglia who "Patty" was,

he was told her name was Denise Rose, and that was the reason he interrogated Denise Rose.

67.    Castaldo and Quick brought Rose to the PCSD station, and Rose denied any knowledge

of the events surrounding Wright's death. Castaldo threatened to charge her with conspiracy to

commit murder and send her to jail for 25 years to life, and she agreed to give a statement

implicating DiPippo and Krivak.

68.    To make Rose's statement believable, Castaldo and Quick, under Stephens's direction,

fed her non-public details of the crime consistent with their theory of the case—just as Stephens

had done in the Deskovic case, and with other individuals before and after.

69.    For example, Defendants showed Rose photographs of Wright's recovered clothes from

the crime scene, including her jeans, brown jacket, blood-stained sneakers, white t-shirt, and

blue hologram pendant, as well as the lizard earring and the cat's eye ring, and then deliberately

included those details in her statement so that it would appear reliable.

70.    They also told her that Wright's bra was found tied around her face, her underwear was

pushed into her throat, and her hands were tied in front of her body, consistent with the police's

mistaken belief at the time about how her hands had been tied.

71.    Defendant Castaldo brought Rose to Krivak's van, which was in the PCSD parking lot,

and had her approach and examine it.

72.    In an April 2, 1996 statement, Rose stated that she had been in a vehicle with Anthony

DiPippo, Andrew Krivak, Adam Wilson, Bill MacGregor and Josette Wright on a night in

October, but denied being present for Wright's murder.

73.     But Defendants Stephens, Castaldo, and Quick were not satisfied with Rose's April 2, 1996 statement because she said that Wright was still alive in the van when she went home. Defendants needed an eyewitness to the actual rape and murder if they were going to close their case.

74.     Defendant Castaldo threatened to have Rose arrested if she did not get the story straight.

75.     In fact, over the next two days, Rose was arrested and charged with felony criminal mischief and a DWI.

76.     Rose knew that she faced seven and a half years in prison, as she testified during Anthony DiPippo's first trial, and so she changed her story.

77.     On April 10, 1996, Rose gave Defendants Castaldo and Quick a statement containing additional details fed to her by the Defendants which corroborated their theory, but still refused to say that she had witnessed the murder.

78.     Two weeks later, Defendants Castaldo and Quick interviewed Rose again at the PCSD. This time the interrogation lasted between 5 and 6 hours.

79.     During that interrogation, Rose became the eyewitness the Defendants were looking for.

80.     Unlike her previous statements, the statement Denise Rose adopted on April 24, 1996 states that she witnessed Andy Krivak and Anthony DiPippo rape Josette Wright in Andy Krivak's van on the night of October 3. That statement included the following non-public details which were known to or believed by the police as of April 24, 1996:

        a.   That the crimes occurred on October 3, 1996;

        b.   That Wright was wearing jeans;

        c.   That Wright's underwear was stuffed in her mouth;

        d.   That Wright's hands were bound in the front with rope;

e.   That Wright's bra was wrapped tightly around her neck;

f.   That Wright's body was left in the woods a short walk from Fields Lane.

81.    Each of those details originated with Defendants, not Denise Rose. But Defendants consistently misrepresented in written and oral reports that those details had originated with Rose.

82.    Significantly, Rose's statement included a fact that police believed at the time of the investigation that later turned out not to be true: that Wright's hands had been bound in the front.

83.    Based on the arrangement of Wright's skeleton, police wrongly believed that her hands had been bound in front of her body. Later forensic testing showed that Wright had been hogtied, with her hands behind her back, but, as her body decomposed, her hands slid through her torso, giving the appearance that they had been bound in the front.

84.    If Rose had truly seen Wright's rape and murder, she never would have claimed that Wright's hands had been bound in the front. In fact, Rose did not witness Wright's rape and murder, and her statement included only those facts that Defendants Castaldo and Quick *believed* to be true, including their incorrect belief that Wright's hands had been bound in front—an assertion that forensic examination has since shown to be false.

85.    Defendants denied and kept hidden from the prosecution and DiPippo's defense counsel that they had coerced or threatened Rose in any way, given her promises of leniency, or fed her details about the crime in order to make her account seem more reliable.

86.    After Denise Rose signed the statement, Defendant Castaldo drove her to Fields Lane and pointed in the direction where Wright's body had been found, so that she could later identify the place.

87.     Castaldo consistently denied feeding Rose the non-public information in her statements.

88.     After coercing the false inculpatory statement, Defendant Castaldo showed up repeatedly at Denise Rose's house to intimidate her into sticking with the story. Castaldo frequently met with Rose and reviewed the story, outside the presence of her family, prepping her again and again, picking her up, and demanding that she get the story straight.

89.     In the eighteen months between October 3, 1994, when Rose supposedly sat a few feet from DiPippo while he raped and murdered a young girl and threatened Rose to keep quiet about it, and April 1996, when she falsely accused him of the crimes, Rose and DiPippo maintained a close friendship that at one point turned romantic and intimate. They spent many hours in each other's company and regularly attended dance parties together. Rose never expressed fear of DiPippo or hesitated to spend time with him before April 1996, when Defendants coerced her statements.

90.     Denise Rose's parents noted a change in their daughter's demeanor after her meetings with Defendants in April 1996, but not in 1994 after Wright's disappearance. When Denise's parents took her to North Carolina to try to get her to relax, Denise was fearful, stating that if she did not return to New York, she would be "re-arrested."

91.     Defendants manipulated, pressured, threatened, and terrorized Denise Rose until she provided false evidence fed to her by Defendants that wrongly implicated DiPippo and Krivak in Wright's rape and murder.

92.     Rose testified at all three of DiPippo's trials. Her testimony was the only eyewitness account of his supposed crime, and her coerced statements led to his conviction twice—in 1997 and again in 2010.

93.     Between DiPippo's second and third trials, Rose repeatedly contradicted significant portions of her former testimony in interviews with an Assistant Attorney General and the former Putnam County District Attorney. Still, the lingering effect of Stephens, Castaldo, and Quick's coercion caused her to testify against DiPippo again in 2016.

**Defendants coerce others into falsely claiming to be eyewitnesses.**

94.     After securing the cooperation of Denise Rose, Defendants targeted the other young people identified in Neglia's statement in order to fabricate corroborating evidence of DiPippo's guilt.

### *Adam Wilson*

95.     In May 1996, Defendants Castaldo, Quick, and Stephens brought Wilson to the PCSD station and interrogated him for between 12 and 15 hours without letting him go.

96.     Wilson repeatedly asked for a lawyer, but Defendants Castaldo, Quick, and Stephens told him that he was not entitled to counsel. When Wilson asked to call his mother or his probation officer, Defendants likewise told him no.

97.     Under Stephens's supervision, Defendants Castaldo and Quick presented Wilson with three or four different versions of events related to Wright's disappearance that corroborated the false story that Defendants fed to Denise Rose.

98.     Wilson repeatedly insisted the story the police wanted him to adopt—a ride in Krivak's van with Josette Wright—had not happened.

99.     Defendants Castaldo and Quick presented Wilson with both a carrot and a stick. They promised to help Wilson with any future legal trouble if he corroborated their story, and they threatened to charge him with Wright's rape and murder if he did not sign their pre-written statement.

100.   When Wilson persisted in denying the scenario, Defendant Stephens administered a sham polygraph examination to get Adam to sign Defendants' pre-written statement incriminating DiPippo.

101.   Stephens had a reputation in his department as being skilled at getting confessions through physical, psychological, and emotional coercion. His specialty was goading incriminating statements out of young and vulnerable suspects, with no regard for the truth.

102.   As he did in the Deskovic case, Defendant Stephens administered a sham polygraph examination as an evidence ploy in order to elicit a false admission. As in Deskovic, Defendant Stephens conducted Wilson's exam using the "Arther" method of polygraphy, which was known to be unreliable in the scientific community, and by the date of this case was used only as a tool to get confessions.

103.   Defendant Stephens told Wilson that he failed the polygraph exam, but the exam was a sham designed to get Wilson to give false incriminating statements and there were no results. Stephens later claimed that he lost the results of the polygraph examination and never produced them to DiPippo's counsel. (He made the same claim years earlier when Deskovic's attorney requested the results of Deskovic's sham examination.)

104.   Exhausted and depleted at the end of the night and after being told he failed the polygraph exam, Wilson signed a statement, written by Defendant Quick, claiming that he had been in Krivak's van when the crime happened.

105.   After Wilson signed the statement, Defendant Castaldo slapped Defendant Quick on the knee and said, "we got him," referring to Anthony DiPippo.

106.   Defendants Castaldo and Quick drove Wilson home. On the way, they stopped at Fields Lane as they had with Denise Rose, to show Wilson the place where Wright's body was found, and reviewed the story written in the statement Wilson signed so that he would get it right.

107.   As soon as he got away from Defendants Castaldo, Quick, and Stephens, Wilson retracted his coerced false statement.

108.   The next morning, Wilson called his probation officer, reporting that he had been interrogated at the police station for more than 12 hours and reporting that he had been forced to give a false statement implicating DiPippo and Krivak in Wright's disappearance. Wilson's family hired him a lawyer.

109.   Approximately two days later, Defendants Castaldo and Quick showed up at Wilson's house in an effort to intimidate him, even though they knew he was represented by counsel. Wilson refused to be cowed and continued to insist that his statement implicating DiPippo was false.

110.   Defendants Castaldo and Quick enlisted a friend of Wilson's to videotape Wilson secretly—one of the only times Defendants bothered to record an interview with a purported witness. The friend tried to induce Wilson to retract his earlier recantation, but Wilson repeatedly denied that he had been in the van or had knowledge about Wright's death. The videotape was later given to defense counsel by the former District Attorney. During DiPippo's 1997 trial, Wilson testified that he had not seen Krivak's van on Fields Lane on October 3, 1994, and that he never saw DiPippo assault, rape, or murder Josette Wright.

### *Bill MacGregor*

111.   On June 5, 1996, a PCSD officer called Bill MacGregor to ask about a car accident in Brewster, NY. MacGregor told the officer that he had not seen a car accident, but the officer insisted that it was important to speak in person.

112.   MacGregor agreed to meet the officer in a coffee shop in the Bronx near his work. At the coffee shop, MacGregor was surrounded by several officers and transported to the PCSD.

113.   In Putnam County, Defendants Castaldo and Quick interrogated MacGregor for hours without allowing him to leave.

114.   MacGregor said that he was not at a Citgo Station or in Krivak's van on the night of October 3, 1994, and did not see Josette raped or murdered.

115.   MacGregor never met Josette Wright.

116.   He did not know Denise Rose either, but he met her for the first time later that night at the PCSD.

117.   Notwithstanding his protestations that he had no knowledge about Josette Wright, Defendants Castaldo and Quick told Bill MacGregor that he had to sign the prewritten statement they had prepared.

118.   Defendants Castaldo and Quick threatened that if Bill MacGregor did not sign the statement, he would be charged with drug crimes and with the rape and murder of Wright, even though they knew he did not commit it.

119.   MacGregor was strung out at that time and believed that he would not be able to defend himself if Defendants arrested him.

120.   Defendants Castaldo and Quick put Bill MacGregor in a room with Denise Rose, who fed him their story.

121.   MacGregor did not want to sign the statement, because it was not true, but believed he would not be allowed to leave the police station and would be charged with a crime if he did not sign it. Defendants Castaldo and Quick altered the statement until they produced a version that MacGregor agreed to sign.

122.   MacGregor's statement stated that he had met Anthony DiPippo, Andy Krivak, Denise Rose, Josette Wright, and Adam Wilson at the Citgo gas station in early October, and they had gone for a ride in Krivak's van. Bill MacGregor stated that he passed out so he did not know what happened. Then he was dropped off.

123.   MacGregor testified at DiPippo's first trial in 1997. He falsely told the jury that he had been in Krivak's van on October 3, 1994, with DiPippo, Krivak, Wilson, Rose, and Wright, and that he passed out from drug use after they parked on Fields Lane.

124.   MacGregor later recanted. He testified for the defense at the second trial in 2012 that "the police threatened me, I was never there that day, I don't know who Josette is, I don't know who Denise Rose is…." He also said, "the only criminals I know are criminals in this case were the detectives that came after me." He repeated the substance of that testimony at DiPippo's 2016 trial, where he also appeared as a defense witness.

### *Michael Moynihan*

125.   Defendants knew that Michael Moynihan was someone DiPippo associated with during this time period.

126.   Michael Moynihan and a friend were stopped by two sheriff's cars while walking down Route 52 in Carmel and told that they had to accompany the officers to the PCSD for questioning.

127.   Michael Moynihan was separated from his friend at the station, and Defendant Castaldo handed him a prewritten statement to sign stating that Moynihan had seen DiPippo and Krivak with Wright at the Citgo station on October 3, 1994.

128.   Moynihan refused to sign the statement because he had not been there.

129.   Defendant Castaldo told Moynihan that if he signed the prepared statement, charges against him for a DWI and criminal mischief would go away and threatened that if he did not sign, Moynihan would be prosecuted.

130.   Moynihan did not sign the statement and eventually was convicted on the DWI charge.

131.   Castaldo, Quick, and Stephens coerced or attempted coerce false inculpatory statements from many other witnesses in the course of their fabricated investigation of DiPippo.

**Stephens, Castaldo, and Quick coerce Krivak into giving a false confession.**

132.   Seventeen-year-old Andy Krivak was arrested on July 1, 1996.

133.   That night, Defendant Stephens administered a sham polygraph examination with the express purpose of getting Krivak to confess, regardless of his innocence. As he had years earlier with Jeffrey Deskovic, and more recently with Adam Wilson, Stephens used a mix of psychological and emotional coercion, physical intimidation, physical coercion, and suggestion

to elicit a false confession from Krivak. After concluding the examination, Stephens told Krivak that he "didn't do well."

134.   After hours of interrogation and physical coercion, Krivak falsely confessed that he and DiPippo raped Wright and that DiPippo had killed her.

135.   As with the other witnesses, Defendants fed Krivak non-public details from the crime scene and tried to make sure his testimony aligned with the other coerced statements.

136.   Ultimately, after hours of coercive interrogation including physical assault, Krivak signed a false statement consistent with Denise Rose's false and fabricated statement, in which he admitted to participating in Josette Wright's rape and murder. That statement contained several of the same non-public details Defendants had provided to Denise Rose, including that Josette Wright's hands were tied with rope and her underpants were stuffed in her mouth. Those details originated with Defendants Stephens and Castaldo, not with Krivak.

137.   Later, Krivak stated that the confession was coerced and that he and DiPippo were innocent. He refused to testify against DiPippo even when offered a reduced sentence.

138.   On June 11, 1997, Krivak was convicted of the rape and murder of Josette Wright and remains in prison.

**Defendants presented false evidence to the prosecution and withheld evidence of their misconduct.**

139.   Defendant Stephens and other PCSD supervisors were involved in every step of the investigation, and Defendant Stephens was present for many of the coercive interviews with purported witnesses. Defendant Stephens and other supervisors knew about Defendants Castaldo and Quick's misconduct—they personally participated in much of it—yet they failed to document or disclose it. Defendants Stephens and other supervisors failed to prevent Defendants Castaldo and Quick from engaging in misconduct, participated in and encouraged

the misconduct, and affirmatively misrepresented to prosecutors that no misconduct had occurred.

140.   Defendants Quick, Castaldo, and Stephens knew that the statements they obtained from Denise Rose, Adam Wilson, Bill MacGregor, and Andy Krivak were entirely false. They also knew that those statements were contradicted by evidence of Howard Gombert's guilt.

141.   Defendants disclosed Rose's, Wilson's, MacGregor's, and Krivak's fabricated statements to the prosecution, but affirmatively and repeatedly misrepresented that all the facts in their statements were volunteered by the witnesses without coercion or suggestion. In fact, as Defendants knew, all of the details of the inculpatory statements were provided to the witnesses by police.

142.   Defendants Castaldo and Quick deliberately withheld information about their witnesses' denials and attempted recantations and their own coercive tactics and failed to report what actually happened during their interrogations.

143.   These false and fabricated statements formed the prosecution's theory of the case, and ultimately led to Anthony DiPippo's arrest, prosecution, conviction, and incarceration.

144.   Upon information and belief, Defendant Stephens updated Defendant Thoubboron about all major investigatory developments. Thoubboron was either aware of the misconduct committed by Defendants Stephens, Castaldo, and Quick, or he was willfully blind to it.

145.   Defendants hid their misconduct from the prosecution, defense counsel, the court, and the jury.

146.   Despite their claimed involvement in the crimes, Denise Rose, Bill MacGregor, and Adam Wilson were never charged with any crime in relation to the rape and murder of Josette Wright.

**Defendants sabotage the Gombert investigation.**

147.   After Defendants fixed on Anthony DiPippo as their prime suspect for the rape and murder of Josette Wright, with singular tunnel vision, Defendants ignored and even hid evidence that pointed to Howard Gombert as the likely perpetrator.

148.   Upon information and belief, when Wright's remains were discovered in 1995, Defendants knew that A.F. had been sexually assaulted in a manner that mirrored Wright's rape and murder. Both A.F. and Wright had blond hair and blue eyes. Both girls were bound by rope; both girls had underwear stuffed into their mouths. The rapes happened in the woods within three miles of each other.

149.   Upon information and belief, before Wright's remains were found, PCSD received a tip in November 1995 that R.M.'s body could be found in Fields Lane, but did not share this information with the Carmel Police Department (CPD), which was investigating R.M.'s disappearance.

150.   In the days following the discovery of Wright's remains, officers from the CPD conducted their own search of Fields Lane and found additional physical evidence.

151.   CPD officers reached out to PCSD officers, including Defendants Stephens, Castaldo, and Quick, after Wright's remains were found, to discuss the similarities between R.M.'s and Wright's cases, but Defendants told them that there was no known connection between the two cases.

152.   Despite their attempts to mislead the CPD, PCSD officers knew, or should have known, that the cases were related.

153.   In fact, on the same day that PCSD officers told CPD officers that the cases were unrelated, PCSD Officers asked Gombert's girlfriend, Stephanie Conway, questions about both Josette Wright and R.M. because she had known both girls.

154.   Conway told police that she was with Gombert when he read a missing poster for Wright. Gombert told Conway that the week Wright disappeared, he had seen her walking on Route 52 around the courthouse and given her a ride, but Conway never learned to where.

155.   On or around November 27, 1995, given suspicions about Gombert, the PCSD seized Conway's red car and disassembled it in the garage of the PCSD. Defendants claimed that nothing unusual was found. Upon information and belief, the samples taken from the car were never submitted to the laboratory of the New York State Police or shared with Carmel Police Department.

156.   Upon information and belief, Defendants did not inform the CPD about the car seizure.

157.   The PCSD tried to prevent Carmel Police from connecting the two missing girls, thereby diluting their evidence that Anthony DiPippo was responsible for Josette Wright's death.

**DiPippo's prosecution begins.**

158.   On July 1, 1996, Anthony DiPippo was arrested and charged with the rape and murder of Josette Wright.

159.   The arrest warrant was supported by false, coerced information. In the probable cause affidavit, Defendants did not report and intentionally concealed the prior inconsistent statements of Denise Rose, Bill MacGregor, Adam Wilson, or Andy Krivak, or the fact that they made statements only after threats and coercion.

**Witnesses who saw Wright after October 3, 1994, retract their statements.**

160.    As Anthony DiPippo's first criminal trial grew closer, Defendants Castaldo and Quick realized that several witnesses threatened their theory of the case because they had reported seeing Wright alive after October 3, 1994.

161.    Defendants Castaldo and Quick targeted, harassed, coerced, and pressured at least four witnesses—Alyson Clokey, Lorraine McLaughlin, Dennis Guariglia Jr., and Tina Scorza—to induce them to change their earlier statements about having seen Wright alive after October 3, 1994—to eliminate inconsistencies with Denise Rose's story and their theory of the case.

162.    Shortly after Wright's disappearance, Clokey, who knew Wright from summer school, reported to police that she had seen Wright in the Danbury Mall on October 7, 1994. She stated that Wright had said hello to her before running off in the direction of five teenage boys.

163.    More than two years later, Defendants Castaldo and Quick induced Alyson Clokey to retract the statement.

164.    At DiPippo's second and third trials, however, Alyson Clokey testified that she was certain that the day she saw Wright was October 7, 1994, four days before giving her first statement, because it was the last day of school before the long Columbus Day weekend, which fell on October 7, 1994, and she was returning to the mall for an eye check-up.

165.    McLaughlin, Wright's sixth-grade English teacher, had reported to PCSD officers that she had also seen Wright in a mall, the Poughkeepsie Galleria Mall, on Columbus Day weekend 1994, either October 7 or 8.

166.    In October 1996, Defendant Castaldo prepared a second statement which he pressured McLaughlin to sign, stating that she had seen Wright over the Jewish High Holidays, which fell much earlier that year in September, not Columbus Day weekend.

167.   However, during DiPippo's 2012 and 2016 retrials, McLaughlin retracted this second statement and reiterated that it was Columbus Day weekend (October 7 or 8, 1994) that she had seen Wright at the mall with an older girl.

168.   Defendants also re-contacted Dennis Guariglia, who went to school with Wright's older sister and who had reported seeing Wright while delivering a pizza sometime after October 3, 1994. Guariglia was told that he needed to "change" his statement. When he balked, Defendants Castaldo and Quick threatened that they would come after him. Guariglia went to the PCSD and was told to sign a statement that said he had not seen Wright. When he said he would not sign, an officer threatened to put him in county jail for "a week to start with." Guariglia, who was scared, signed the prepared statement.

169.   On November 26, 1995, Tina Scorza gave a statement to Defendants Castaldo and Quick that she saw Wright sometime in January 1995 at the Danbury Mall and chased her into the parking lot, where Wright told her that she was staying with a boyfriend. Scorza, however, recanted her statement on November 28, 1998, after Defendant Castaldo tracked her down, saying the statement on November 26, 1995, was "not true" and that she "never saw Josette in the Danbury mall or any time after her disappearance."

170.   Upon information and belief, Defendants Castaldo and Quick conspired to pressure and manipulate Alyson Clokey, Lorraine McLaughlin, Dennis Guariglia Jr., and Tina Scorza to bring their statements in line with Defendants' theory of the case.

171.   Defendants misrepresented in written and oral reports that Andy Krivak, Denise Rose, Adam Wilson, Bill MacGregor, Dominick Neglia, Alyson Clokey, Lorraine McLaughlin, Dennis Guariglia, Tina Scorza, and others had volunteered their statements without coercion or suggestion, and otherwise hid their misconduct from defense counsel, the court, and the jury.

**Defendants fabricate additional inculpatory statements falsely attributed to DiPippo.**

172.   In July 1996, Defendants Castaldo and Quick fabricated a statement with Scott Chestnut, a heroin addict and jailhouse snitch, falsely implicating DiPippo in Wright's rape and murder. Castaldo and Quick offered Chestnut a more favorable housing placement in Putnam County Jail in exchange for inculpatory evidence against DiPippo. Chestnut falsely told Castaldo and Quick that DiPippo had admitted that he had sex with Wright but did not kill her. Chestnut testified to this false admission in DiPippo's 1997 and 2012 trials, and the prosecution introduced his prior testimony in the 2016 trial, after he died. DiPippo never made such an admission.

173.   Castaldo and Quick also worked with Defendant Victor Nestor, a correction officer with the Putnam County Sheriff's Department, to fabricate another false inculpatory statement attributed to DiPippo. Nestor falsely claimed in a later written report, prepared in Quick's presence, that DiPippo admitted that he was there at the time of Wright's murder but that he had been high and could not remember anything. Nestor testified to this false admission at all three of DiPippo's trials. DiPippo never made such an admission.

**DiPippo is convicted.**

174.   After a jury trial that took place in May and June 1997, Anthony DiPippo was convicted of the rape and murder of Josette Wright.

175.   Although many of the others recanted, Denise Rose testified consistently with her false and fabricated statement that she witnessed Anthony DiPippo and Andy Krivak rape and murder Josette Wright in Krivak's van on October 3, 1994.

176.   On July 11, 1997, Anthony DiPippo was sentenced to concurrent terms of imprisonment of 25 years to life on the conviction of murder in the second degree, and 8⅓ to 25 years on the

conviction of rape in the first degree. The judgment was affirmed on direct appeal. *People v DiPippo*, 265 A.D.2d 340 (1999).

177.   Between 1997 and 2011, DiPippo continued to protest his innocence, filing numerous challenges to his conviction. DiPippo filed three motions to vacate the judgment pursuant to CPL 440.10. The New York Supreme Court denied these motions without a hearing, and the Appellate Division denied leave to appeal.

**The Second Trial: DiPippo's 2012 retrial**

178.   While incarcerated, DiPippo discovered that his attorney during his first criminal trial had previously defended Howard Gombert against rape allegations and filed a fourth motion to vacate judgment based on the conflict of interest.

179.   On or around March 1, 2011, the New York Supreme Court Appellate Division vacated the judgment of conviction and ordered that DiPippo be granted a new trial. The Court held that trial counsel's admitted failure to investigate Gombert led to the conclusion that if the defendant had been represented by a different attorney, 'the events would have unfolded differently.'" *People v. DiPippo*, 82 A.D.3d 786 (2d Dept. 2011).

180.   However, during the second jury trial, the New York Supreme Court still erroneously refused to admit evidence of Gombert's guilt, and DiPippo was again convicted for the rape and murder of Josette Wright. On August 10, 2012, DiPippo was sentenced to twenty-five years to life based on false testimony—mainly that of Denise Rose.

181.   The Appellate Division, Second Department, upheld the conviction. *See People v. DiPippo*, 117 A.D.3d 1076 (2d Dept. 2014).

**DNA evidence proves that Wright had not been raped and murdered in Krivak's van and shows that DiPippo and Krivak had not murdered Wright.**

182.   Years after DiPippo's conviction, private DNA testing of multiple areas of Krivak's van determined that there was no DNA evidence that Wright had ever been in the van. Given that the van had remained impounded in police custody and that Wright had supposedly been raped and murdered in a brutal struggle with two men twice her size, the testing should have yielded ample evidence of Wright's DNA. Because it did not, the testing proved that Defendants were wrong: DiPippo and Krivak had not raped or murdered Wright. Subsequent testing by the New York State Police laboratory confirmed that none of Wright's DNA could be found in the van.

**An independent investigation reveals some of Defendants' misconduct.**

183.   In February 2015, Defendant Castaldo was indicted on charges of official misconduct, assault, and offering a false instrument for filing, after a video emerged showing Defendant Castaldo beating and possibly kicking a subdued, shackled prisoner inside the Carmel courthouse. *See https://www.youtube.com/watch?v=dqPm3ha776M.*

184.   In light of Castaldo's indictment, incumbent Putnam County District Attorney (DA) Adam Levy, whose office had previously prosecuted Anthony DiPippo, decided to reexamine his case.

185.   DA Levy reached out to the office of the Attorney General for assistance with the reinvestigation.

186.   Through that investigation, information emerged suggesting that Defendant Castaldo had tampered with witness testimony and withheld information from the Carmel Police Department and the defense.

187.   DA Levy had found notes in the PCSD's file related to the R.M. investigation that were never turned over to the CDP or Anthony DiPippo's defense team.

188.   DA Levy suggested that a motion to the vacate judgment against DiPippo would be proper and began to assist DiPippo's defense counsel in drafting this motion.

189.   In 2015, DA Levy and officials from the Attorney General's office flew to Florida to re-interview Denise Rose.

190.   The DA and the Assistant Attorney General (AAG) uncovered evidence that Denise Rose's prior inculpatory statements were inconsistent and were the result of duress by Defendant PCSD officers. They further concluded that Defendant Castaldo had shown Denise Rose many pieces of evidence and repeatedly met with her to mold aspects of her testimony.

191.   Denise Rose also admitted to DA Adam Levy and the AAG that Defendants Castaldo and Quick had threatened her with criminal prosecution if she refused to testify against Anthony DiPippo.

192.   DA Levy continued to help DiPippo's defense counsel draft a motion to vacate his conviction, but in November 2015, before the motion was finalized, Levy lost the reelection for the Putnam County DA.

193.   Nobody remained to reinvestigate DiPippo's conviction or offer any leniency.

194.   Nevertheless, on March 29, 2016, the Court of Appeals reversed DiPippo's conviction and ordered a new trial because "under the circumstances of this case, defendant should have been permitted to present evidence of third-party culpability to the jury." *People v. DiPippo*, 27 N.Y.3d 127, 131 (2016).

195.   Based on Defendants' continuing misrepresentations, the new District Attorney decided to continue the prosecution of DiPippo.

**A third jury acquits Anthony DiPippo.**

196.   Anthony DiPippo's third criminal trial took place between September 15, 2016 and October 11, 2016. For the first time at this trial, DiPippo's defense could introduce evidence about Howard Gombert's culpability.

197.   On October 11, 2016, the jury acquitted DiPippo and he walked out of the courtroom a free man after more than 20 years and one month of wrongful incarceration.

**Putnam County had a policy, practice, or custom of misconduct.**

198.   Prior to and at the time of the unlawful investigation, prosecution, and convictions of Anthony DiPippo, the County of Putnam and the PCSD, by and through their final policymakers, maintained a policy, custom, or pattern and practice of promoting, facilitating, or condoning improper, illegal, and unconstitutional investigative techniques in serious felony investigations. Those techniques included but were not limited to: (a) using improper interrogation and interview techniques, including sham polygraph examinations, to obtain false and inculpatory witness statements, including by providing non-public information to witnesses in order to make unreliable statements appear reliable; (b) fabricating evidence; (c) failing to document and disclose material, exculpatory, and impeachment evidence to prosecutors; and (d) failing to investigate known exculpatory evidence; (e) misreporting the circumstances under which officers obtained incriminating evidence; and (f) otherwise failing to conduct constitutionally adequate investigations.

199.   Prior to and at the time of the unlawful investigation, prosecution, and conviction of Anthony DiPippo, the County of Putnam and the PCSD, by and through their final policymakers, maintained a policy, custom, or pattern and practice of failing to adequately supervise, discipline and train PPD investigators in connection with fundamental investigative

tasks implicating the constitutional rights of witnesses and suspects, including but not limited to conducting custodial interrogations and witness interviews, and documenting and disclosing exculpatory and impeachment evidence to prosecutors.

200.   The PCSD's policy, custom, or pattern and practice of investigative misconduct and failure to supervise, discipline and train PCSD officers were reflected by the multiple acts of misconduct and illegality committed by multiple PCSD officers and supervisors in relation to multiple suspects and witnesses in the Josette Wright investigation, as described above, as well as in the 1989-1990 investigation into the rape and murder of Angela Correa, the crime for which Jeffrey Deskovic was wrongly convicted.

201.   The PCSD's policy, custom, or pattern and practice of investigative misconduct and failure to supervise, discipline and train were also reflected in numerous prior cases and investigations which, upon information and belief, were known to the PCSD defendants and policymakers prior to the Josette Wright investigation. The misconduct committed in those cases by PCSD investigators, including but not limited to Defendants Stephens and Castaldo and other investigators involved in DiPippo's case, was actually or constructively known to PCSD supervisors and policymakers prior to the Josette Wright investigation—including by means of their direct participation in the investigations, an independent state investigation of the PCSD and/or by published judicial decisions exposing the investigative misconduct—and, upon information and belief, PCSD supervisors and policymakers failed to train, supervise, discipline, or otherwise remediate PCSD investigators in response to such notice.

## DAMAGES

202.   Defendants' unlawful, intentional, willful, deliberately indifferent, reckless, and bad-faith acts and omissions caused Anthony DiPippo to be falsely arrested and imprisoned, unfairly

tried, wrongfully convicted, and forced to serve nearly twenty years imprisoned. DiPippo was falsely labeled a sex offender and was denied prison privileges such as trailer visits with family, work assignments, and educational opportunities. He remained falsely imprisoned until his release in 2016.

203.   As a direct result of Defendants' intentional, bad faith, willful, wanton, reckless, and deliberately indifferent acts and omissions, DiPippo sustained injuries and damages, which continue to date and will continue into the future, including: loss of freedom for more than 19 years; physical pain and suffering; severe mental anguish; emotional distress; loss of family relationships; severe psychological damage; loss of property; legal expenses; loss of income and career opportunities; humiliation, indignities, and embarrassment; degradation; damage to reputation; loss of quality and enjoyment of life; permanent loss of natural psychological development; and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression, for which he is entitled to monetary relief.

204.   As a direct result of Defendants' intentional, bad faith, willful, wanton, reckless, and deliberately indifferent acts and omissions, DiPippo was also deprived of his familial relationships.

205.   As a direct result of Defendants' intentional, bad faith, willful, wanton, reckless, and deliberately indifferent acts and omissions, DiPippo sustained physical injuries and damages, including physical pain and suffering, personal injuries, physical illness, inadequate medical care, for which he is entitled to monetary relief.

206.   DiPippo continues to suffer physical, emotional, mental, and psychological damage as a result of the Defendants' conduct.

207.   These injuries and damages to DiPippo were foreseeable to Defendants at the time of their acts and omissions.

208.   All of the acts and omissions committed by Defendants were done intentionally, unlawfully, maliciously, wantonly, recklessly, negligently, and with bad faith, and said acts meet all of the standards for imposition of punitive damages.

## CLAIMS FOR RELIEF

## FEDERAL CAUSES OF ACTION

## COUNT I

### 42 U.S.C. § 1983 Malicious Prosecution in Violation of the Fourth and Fourteenth Amendments

209.   Plaintiff hereby incorporates by reference all of the foregoing paragraphs.

210.   Defendants, acting individually and in concert, with malice and knowing that probable cause did not exist to prosecute Anthony DiPippo for the rape and murder of Josette Wright, intentionally caused DiPippo to be arrested, charged, and prosecuted for those crimes, thereby violating DiPippo's clearly established right, under the Fourth and Fourteenth Amendments to the U.S. Constitution, to be free of prosecution absent probable cause.

211.   Specifically, as described in detail above, Defendants, acting individually and in concert, fabricated evidence and intentionally withheld and misrepresented exculpatory facts that they knew would have vitiated probable cause against DiPippo and they knew would have impeached witnesses for the prosecution at trial, including but not limited to the fact that Defendants conspired to plant Wright's jewelry in Krivak's van and obtained false inculpatory statements through coercion.

212.   These Defendants also failed to conduct a constitutionally adequate investigation in light of evidence pointing to Howard Gombert's culpability and away from DiPippo.

213.   DiPippo is completely innocent of the rape and murder of Josette Wright.

214.   After three trials, the prosecution finally terminated in DiPippo's favor on October 11, 2016, when a jury acquitted DiPippo.

215.   Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to DiPippo's clearly established constitutional rights. No reasonable officer in 1995 would have believed this conduct was lawful.

216.   The acts and omissions by Defendants described in the preceding paragraphs were the direct and proximate cause of DiPippo's injuries because these Defendants knew, or should have known, that their conduct would result in the wrongful arrest, prosecution, conviction, and incarceration of DiPippo.

## <u>COUNT II</u>

**42 U.S.C. § 1983 Deprivation of Liberty without Due Process of Law and Denial of Fair Trial by Fabricating Evidence, Withholding Material Exculpatory and Impeachment Evidence, and Deliberately Failing to Conduct a Constitutionally Adequate Investigation in Violation of the Fourteenth Amendment**

217.   Plaintiff hereby incorporates by reference all of the foregoing paragraphs.

218.   Defendants, acting individually and in concert, and within the scope of their employment with the PCSD, deprived DiPippo of his clearly established constitutional right to due process of law and to a fair trial.

219.   Defendants deprived DiPippo on his right to a fair trial by deliberately fabricating false inculpatory evidence and using coercion and/or undue suggestion to obtain inculpatory witness statements, including without limitation, fabricating the false statements of Denise Rose, Adam

Wilson, Bill MacGregor, Andy Krivak and others. Defendants then concealed the misconduct that had produced those statements, including but not limited to coercive and suggestive tactics used in witness interviews.

220.   These Defendants deprived DiPippo of his right to a fair trial by withholding material exculpatory and impeachment evidence from prosecutors and defense, including without limitation, exculpatory statements of alleged witnesses prior to their coerced, false statements.

221.   Had Defendants' fabrications and material, exculpatory and impeachment evidence known to them been documented and/or disclosed, they would have tended to prove DiPippo's innocence, cast doubt on the entire police investigation and prosecution, and impeached the critical trial testimony of Denise Rose and other witnesses. The exculpatory and impeachment evidence withheld by Defendants undermines confidence in the verdict against DiPippo, and the concealment of this evidence deprived DiPippo of a fair criminal trial.

222.   These Defendants deprived DiPippo of his right to a fair trial by deliberately failing to conduct a constitutionally adequate investigation, including without limitation by failing to investigate leads pointing towards other suspects and corroborating DiPippo's innocence and by failing to provide information to the Carmel Police Department.

223.   Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to DiPippo's clearly established constitutional rights. No reasonable officer in 1995 would believe this conduct was lawful.

224.   The acts and omissions of Defendants, as described in the preceding paragraphs, were the direct and proximate cause of DiPippo's injuries. These Defendants knew, or should have

known, that their conduct would result in DiPippo's wrongful arrest, prosecution, conviction, and incarceration.

## COUNT III

### 42 U.S.C. § 1983 Failure to Intervene

225.   Plaintiff hereby incorporates by reference all of the foregoing paragraphs.

226.   By their conduct and under color of state law, Defendants, acting within the scope of their employment, had opportunities to intervene on behalf of DiPippo to prevent his malicious prosecution and deprivation of liberty without due process of law, but with deliberate indifference, declined to do so.

227.   These Defendants' failures to intervene violated DiPippo's clearly established constitutional right not to be deprived of liberty without due process of law as guaranteed by the Fourteenth Amendment. No reasonable police at the times relevant to this complaint would have believed that failing to intervene to prevent these Defendants from fabricating inculpatory evidence or causing DiPippo to be arrested and prosecuted without probable cause, were lawful.

228.   These Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of DiPippo's injuries. Defendants knew, or should have known, that their conduct would result in DiPippo's wrongful arrest, prosecution, conviction, and incarceration.

## COUNT IV

### 42 U.S.C. § 1983 Civil Rights Conspiracy

229.   Plaintiff hereby incorporates by reference all the foregoing paragraphs.

230.   Defendants Stephens, Castaldo, Quick, and Nestor, acting within the scope of their employment and under color of state law, agreed among themselves and with others, including

40

Denise Rose and Scott Chestnut, to act in concert in order to deprive DiPippo of his clearly established Fourth, Fifth, and Fourteenth Amendment rights to be free from unreasonable searches and seizures, malicious prosecution, coercion, deprivation of liberty without due process of law, and to a fair trial, as well as depriving him of his First and Fourteenth Amendment rights of access to courts and executive clemency.

231.   In furtherance of the conspiracy, each defendant engaged in and facilitated numerous overt acts, including, without limitation, the following:

     a.  Defendants Stephens, Castaldo, and Quick, worked in concert with Rose to fabricate eyewitness testimony falsely implicating DiPippo in the rape and murder of Josette Wright, including without limitation Rose's false statements to police, which falsely stated that material, nonpublic facts regarding investigators' theory of the crime originated with Rose and not with investigators; and failed to document and disclose material exculpatory evidence to prosecutors, including, without limitation, the fact that Rose's account was false and that the details of her account originated with investigators, not Rose;

     b.  Defendants Stephens, Castaldo, Quick, and Nestor worked in concert together to fabricate Nestor's false statement that DiPippo gave inculpatory admissions during his pretrial detention; and failed to document and disclose material, exculpatory evidence to prosecutors, including, without limitation, the fact that Nestor's account was false;

     c.  Defendants Stephens, Castaldo, and Quick worked in concert with Chestnut to develop false inculpatory evidence against DiPippo by promising Chestnut a more favorable housing placement in Putnam County jail in exchange for his

false statement claiming that DiPippo gave inculpatory admissions during his

pretrial detention; and Defendants failed to document and disclose material,

exculpatory evidence to prosecutors, including, without limitation, the fact that

Chestnut's account was false;

d. Defendants Stephens, Castaldo, and Quick worked in concert to fabricate false

inculpatory evidence in the form of jewelry purportedly taken from Krivak's van

that purportedly belonged to Wright; and failed to disclose material, exculpatory

evidence to prosecutors, including, without limitation, the fact that the jewelry

was either not found in Krivak's van or did not belong to Wright.

e. Defendants Castaldo, Quick, and Nestor, and Denise Rose and Scott Chestnut,

deliberately provided perjured testimony in the grand jury, pretrial hearings, and

in one or more of DiPippo's trials, consistent with their out-of-court

misrepresentations in documents and other official communications and in

furtherance of their wrongful intent to deprive DiPippo of his constitutional

rights.

232.   As a direct and proximate result of Defendants' actions, DiPippo was wrongfully

convicted and imprisoned for nearly 20 years and suffered the other grievous damages and

injuries set forth above.

## COUNT V

**42 U.S.C. § 1983 Supervisory Liability Claim**

*Against Defendants Thoubboron and Stephens*

233.   Plaintiff hereby incorporates by reference all of the foregoing paragraphs.

234.   Defendants Castaldo, Quick, and Stephens acted with impunity in an environment in which they were not adequately supervised, disciplined, or trained by Defendants Thoubboron and/or Stephens in this case and as a matter of practice.

235.   Defendants Thoubboron and/or Stephens acted with gross negligence, recklessness, and/or deliberate indifference to the constitutional rights of citizens by failing to provide adequate training, supervision, and discipline of the Defendant Officers, and thereby caused the individual Defendant Officers to deprive Anthony DiPippo of his clearly established constitutional rights, including his rights to be free from false imprisonment, malicious prosecution, and deprivation of liberty without due process of law, and his right to a fair trial.

236.   Had Defendants Putnam County, the PCSD, Thoubboron, and Stephens not provided grossly inadequate training, supervision, and discipline of the Defendant Officers, they would not have fabricated inculpatory evidence, failed to disclose exculpatory evidence, and intentionally and maliciously caused Anthony DiPippo to be arrested and prosecuted without probable cause. Defendants Thoubboron, and Stephens were directly involved in the investigation of Anthony DiPippo and directly supervised the specific investigative acts taken by the PCSD officer defendants in this case.

237.    The grossly negligent, reckless, and/or deliberately indifferent conduct of Defendants Thoubboron, and Stephens under color of state law violated their duty, which had been clearly established by 1995, to supervise Defendants Castaldo, Quick, and Stephens, and no reasonable

43

police supervisor by 1995 would have believed that grossly negligent, reckless, and/or deliberately indifferent supervision in the face of actual or constructive notice of misconduct by their subordinate officers was lawful.

238.   As a direct and proximate result of Defendants' actions, Anthony DiPippo was wrongly convicted and imprisoned for nearly twenty years and suffered the other grievous and continuing damages and injuries set forth above.

## COUNT VI

### 42 U.S.C. § 1983 *Monell* Claim

#### *Against Defendant Putnam County*

239.   Plaintiff hereby incorporates by reference all of the foregoing paragraphs.

240.   Defendant County of Putnam was at all times relevant to this Complaint responsible for the policies, practices, and customs of the Putnam County Sheriff's Office.

241.   Defendant County of Putnam by and through its final policymakers, had in force and effect during the Josette Wright investigation and for years beforehand, a policy, practice, or custom of unconstitutional misconduct in serious felony investigations, including in particular the encouragement and use of, and reliance on, improper interrogation and interview techniques to obtain false and inculpatory witness statements; the fabrication of incriminating statements from witnesses, suspects, and arrestees by feeding nonpublic facts about the crime that only the police and the true perpetrator would know; the encouragement and use of, and reliance on witness statements that law enforcement knew or should have known were false; the fabrication of inculpatory evidence; the suppression of exculpatory and/or impeachment evidence; ignoring evidence that suggests the innocence of law enforcement's suspects; and the intentional failure to conduct adequate investigations of crimes.

242.   Defendant County of Putnam by and through its final policymakers, had in force and effect during the Josette Wright investigation and for years beforehand, a policy, practice, or custom of failing to adequately supervise, discipline and train officers investigating serious felonies.

243.   Final policymakers for Putnam County had actual or constructive notice of, but repeatedly failed to make any meaningful investigation into charges that PCSD officers were using the misconduct described above to close cases. Final policymakers for Putnam County also had actual or constructive notice that widespread failures to supervise or discipline officers for misconduct committed during the course of serious felony investigations enabled officers to engage in misconduct without repercussion. The continued adherence to these unconstitutional municipal customs, practices and/or policies amounted to deliberate indifference to the constitutional rights of criminal defendants like Anthony DiPippo and Andy Krivak.

244.   Such unconstitutional municipal customs, practices and/or policies were the moving force behind DiPippo's arrest, prosecution, and almost twenty-two years of incarceration, as well as all the other grievous injuries and damages set forth above.

## STATE LAW CLAIMS

## COUNT VII

### Malicious Prosecution under New York state law

245.   Plaintiff hereby incorporates by reference all of the foregoing paragraphs.

246.   Defendants initiated or continued proceedings against DiPippo without probable cause and with malice. Specifically, they intentionally and knowingly deliberately misrepresented the truth and withheld exculpatory facts from prosecutors and the grand jury that vitiated probable cause, including but not limited to the facts that the incriminating witness statements were

fabricated and the product of coercion, and that Defendants fed witnesses nonpublic details they

did not know and could not have known, because DiPippo is innocent.

247.   The proceedings ultimately terminated in DiPippo's favor on June 8, 2016, when a jury

acquitted DiPippo and he was released from prison after more than nineteen years of wrongful

incarceration.

248.   Defendants committed these acts within the scope of their employment.

249.   As a direct and proximate result of this malicious prosecution, DiPippo sustained the

injuries set forth above.

## COUNT VIII

**Intentional or Reckless Infliction of Emotional Distress under New York state law**

250.   Plaintiff hereby incorporates by reference all of the foregoing paragraphs.

251.   Defendants intentionally and/or recklessly, and in breach of their duties owed to DiPippo,

directly and proximately caused DiPippo, an innocent man, to be falsely arrested, maliciously

prosecuted, and wrongly imprisoned for more than nineteen years.

252.   Defendants caused DiPippo to suffer physical harm, including physical ailments resulting

from the circumstances and duration of his wrongful incarceration, and to fear for his physical

safety throughout the period of his pretrial and postconviction incarceration.

## COUNT IX

**Negligent Infliction of Emotional Distress under New York state law**

253.   Plaintiff hereby incorporates by reference all of the foregoing paragraphs.

254.   Defendants negligently and grossly negligently, and in breach of their duties owned to

DiPippo, directly and proximately caused DiPippo, an innocent man, to be falsely arrested,

maliciously prosecuted, and wrongly imprisoned for more than nineteen years.

255. Defendants caused DiPippo to suffer physical harm, including physical ailments resulting from the circumstances and duration of his wrongful incarceration, and to fear for his physical safety throughout the period of his pretrial and postconviction incarceration.

## COUNT X

### Respondeat Superior Liability

*Against Defendant Putnam County*

256. Plaintiff hereby incorporates by reference all of the foregoing paragraphs.

257. Defendants were at all times material to this complaint employees of the Putnam County Sheriff's Office and Putnam County's District Attorney's Office, and acted within the scope of their employment in committing the misconduct described above.

258. Defendants' tortious conduct was undertaken while carrying out routine investigative functions. The conduct was reasonably expected by, and in fact foreseen by, Defendants' employer.

259. Defendant Putnam County is liable as principal for all intentional torts committed by its agents.

**WHEREFORE**, Plaintiff Anthony DiPippo prays as follows:

    A. That the Court award compensatory damages to Plaintiff and against all Defendants, jointly and severally, in an amount to be determined at trial;

    B. That the Court award punitive damages to Plaintiff, and against all individual Defendants in their individual capacity, in an amount to be determined at trial, that will deter such conduct by Defendants in the future;

    C. For a trial by jury;

D.  For pre-judgment and post-judgment interest and recovery of Plaintiff's costs, including

     reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. §1983 claims;

     and

E.  For any and all other relief to which Plaintiff may be entitled.

                                        Respectfully submitted,

                                        October 16, 2017


                                        /s/ Nick Brustin
                                        Nick Brustin
                                        Emma Freudenberger
                                        Richard Sawyer
                                        Neufeld Scheck & Brustin, LLP
                                        99 Hudson Street, Eighth Floor
                                        New York, NY 10013
                                        (212) 965-9081

                                        Benjamin Brafman
                                        Mark M. Baker
                                        Marc Agnifilo
                                        Brafman & Associates, P.C.
                                        767 Third Avenue, 26th Fl.
                                        New York, NY 10017
                                        (212) 750-7800