# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ANTHONY DiPIPPO,<br><br>      Plaintiff,<br><br>v.<br><br>COUNTY OF PUTNAM; Putnam County Sheriff's Department Sheriffs ROBERT THOUBBORON in his individual capacity; Putnam County Sheriff's Department Investigators DAN STEPHENS, PATRICK CASTALDO, BILL QUICK, and Putnam County Sheriff's Department Officer VICTOR NESTOR, in their individual capacities,<br><br>      Defendants. | **Case No. 17-cv-7948 (NSR)** |

**Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss**

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

ALLEGATIONS .................................................................................................................. 3

    Howard Gombert rapes and murders Josette Wright. ...................................................... 3

    Sheriff Thoubboron orders Stephens to close the investigation quickly. ...................................... 3

    Stephens, Castaldo, and Quick use the same unconstitutional tactics to elicit or attempt to elicit false statements from at least six witnesses. ...................................................... 4

        *Dominick Neglia* ............................................................................................ 4

        *Denise Rose* ................................................................................................. 5

        *Adam Wilson* ............................................................................................... 6

        *Bill MacGregor* ............................................................................................ 7

        *Andrew Krivak* ............................................................................................ 7

        *Michael Moynihan* ......................................................................................... 8

        Additional Witnesses ........................................................................................ 8

    Defendant Victor Nestor fabricates a jailhouse confession. ...................................................... 8

    DiPippo is tried and convicted in 1997 and 2012—and finally acquitted in 2016. ................... 9

LEGAL STANDARD .......................................................................................................... 10

ARGUMENT ...................................................................................................................... 11

    I.    DiPippo pleaded a plausible *Monell* claim under three different legal theories. ............... 11

        A.   The PCSD had an unofficial policy of coercing witness statements in high-profile homicide investigations. ................................................................................ 12

        B.   PCSD failed to supervise its investigators during the original investigation and before the 2012 trial. ................................................................................................ 15

        C.   Sheriff Thoubboron, the final policymaker, solicited Stephens's misconduct. ............. 18

    II.   DiPippo pleaded a plausible supervisory liability claim against Sheriff Thoubboron. ..... 19

    III.  DiPippo's fabrication claim against Defendant Nestor should go forward. ...................... 21

    IV.  DiPippo's failure to intervene claims are pleaded in the alternative. ............................... 23

CONCLUSION .................................................................................................................... 24

# <u>TABLE OF AUTHORITIES</u>

## Cases

*Allah v. Annucci*, 16-cv-1841 (KMK), 2017 WL 3972517 (S.D.N.Y. Sept. 7, 2017)................. 20

*Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113 (2d Cir. 2004) ............................... 12, 16, 18

*Anderson News, LLC v. Am. Media, Inc.*, 680 F.3d 162 (2d Cir. 2012) ...................................... 11

*Arista Records, LLC v. Doe 3*, 604 F.3d 110 (2d Cir. 2010) .................................................. 10, 20

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...................................................................................... 20

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................................... 10, 11

*Bucy v. City of White Plains*, 14-cv-1806 (VB), 2015 WL 8207492 (S.D.N.Y. Dec. 7, 2015).... 24

*Castilla v. City of New York*, No. 09 Civ. 5446(SHS), 2012 WL 3871517 (S.D.N.Y. Sept. 6, 2012).................................................................................................................................... 14

*Coggins v. Buonora*, 776 F.3d 108 (2d Cir. 2015) ..................................................................... 21

*Colon v. City of New York*, 09-cv-8 (JBW) 2009 WL 4263362 (E.D.N.Y. Nov. 25, 2009) ........ 14

*Colon v. Coughlin*, 58 F.3d 865 (2d Cir.1995) ........................................................................... 20

*Corbett v. Annucci*, 16-cv-4492 (NSR), 2018 WL 919832 (S.D.N.Y. Feb. 13, 2018)................. 20

*Cumberbatch v. Port Auth. of N.Y. & N.J.*, 03-cv-749 (BSJ), 2006 WL 3543670 (S.D.N.Y. Dec. 5, 2006)................................................................................................................................... 24

*Deskovic v. City of Peekskill*, 894 F. Supp. 2d 443 (S.D.N.Y. 2012)........................................... 17

*Edwards v. City of New York*, No. 14-CV-10058 KBF, 2015 WL 5052637 (S.D.N.Y. Aug. 27, 2015).................................................................................................................................... 18

*Ferrari v. Cnty. of Suffolk*, 790 F. Supp. 2d 34 (E.D.N.Y. 2011).................................................. 14

*Fiacco v. City of Rensselaer*, 783 F.2d 319 (2d Cir. 1986) ........................................................ 16

*Garnett v. Undercover Officer C0039*, 838 F.3d 265 (2d Cir. 2016) ........................................... 21

*Gregory v. City of Louisville*, 444 F.3d 725 (6th Cir. 2006)......................................................... 22

*Guerrero v. City of New York*, 16-cv-516 (JPO), 2017 WL 2271467 (S.D.N.Y. May 23, 2017) 23

*H.H. v. City of New York*, 11-cv-4905 (NG) (ST), 2017 WL 3396434 (E.D.N.Y. Aug. 7, 2017)

................................................................................................................................................. 16, 17

*Hunter v. City of New York*, 35 F. Supp. 3d 310 (E.D.N.Y. 2014)................................................ 13

*Jeffes v. Barnes*, 208 F.3d 49 (2d Cir. 2000) .............................................................................. 19

*Johnson v. Han*, 14-cv-13274-IT, 2015 WL 4397360 (D. Mass. July 17, 2015) ........................ 23

*Keiler v. Harlequin Enters. Ltd.*, 751 F.3d 64 (2d Cir. 2014)....................................................... 11

*Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415 (2d Cir. 2009)...................... 13

*Osterhoudt v. City of New York*, 10-cv-3173, 2012 WL 4481927 (E.D.N.Y. Sept. 27, 2012)..... 15

*Pierce v. Gilchrist*, 359 F.3d 1279 (10th Cir. 2004) .................................................................... 22

*Reyes v. County of Suffolk,* 995 F. Supp. 2d 215 (E.D.N.Y. 2014) .............................................. 14

*Ricciuti v. N.Y.C. Tr. Auth.*, 124 F.3d 123 (2d Cir. 1997) ................................................ 21, 22, 23

*Safepath Sys. LLC v. N.Y.C. Dep't of Educ.*, 563 F. App'x 851 (2d Cir. 2014) .......................... 11

*Sorlucco v. New York City Police Dept.*, 971 F.2d 864 (2d Cir. 1992) ……………………..13, 14

*Tyus v. Newton*, 13-cv-1486 (SRU), 2015 WL 1471643 (D. Conn. Mar. 31, 2015) ................... 14

*Vann v. City of New York*, 72 F.3d 1040 (2d Cir. 1995).............................................................. 15

*Walker v. City of New York*, 974 F.2d 293 (2d Cir. 1992)............................................................ 17

*Warren v. Pataki*, 823 F.3d 125 (2d Cir. 2016) .......................................................................... 20

*Wray v. City of New York*, 490 F.3d 189 (2d Cir. 2007)............................................................... 15

*Ying Li v. City of New York*, 246 F. Supp. 3d 578 (E.D.N.Y. 2017) ...................................... 22, 24

## Statutes

42 U.S.C. § 1983................................................................................................................................ 1

**Rules**

Federal Rule of Civil Procedure 8(d)(3) ........................................................................ 23

## INTRODUCTION

Though innocent, Plaintiff Anthony DiPippo spent nearly two decades in prison because Defendants, Putnam County police officers, fabricated evidence implicating him in the brutal rape and murder of 12-year-old Josette Wright—crimes he did not commit. By following an unofficial policy of using physical and psychological coercion, including threats and sham polygraph examinations, the individual Defendants elicited or attempted to elicit false statements from at least six vulnerable teenagers implicating DiPippo in the crimes. Defendant Dan Stephens, a supervising investigator, was known for using these tactics effectively to close cases. Four years earlier, Stephens had coerced a false confession out of another innocent teenager, Jeffrey Deskovic, by using a sham polygraph examination. (After Deskovic was exonerated, he sued Stephens and won a $41,650,000 verdict against him personally.) Putnam County Sheriff Robert Thoubboron tapped Stephens to head the Wright investigation because Stephens's coercive tactics would get quick results and quell a restive public during an election year. Stephens and two investigators under his supervision, Defendants Patrick Castaldo and Bill Quick, obtained the false statements used to convict DiPippo and his codefendant. Meanwhile, the true perpetrator —serial rapist Howard Gombert—remained free to rape again.

For nearly two decades, DiPippo fought to clear his name. His 1997 conviction was vacated because his defense counsel had previously represented Gombert in a rape trial and did argue the guilt of his former client. At his second trial in 2012, the trial court improperly excluded evidence of Gombert's guilt, and DiPippo was convicted again. In 2016, after the Court of Appeals reversed his second conviction, a jury acquitted DiPippo at his third trial after he was allowed for the first time to present evidence of Gombert's guilt. He now sues under 42 U.S.C. § 1983 and state law for damages arising from his 20 years of wrongful incarceration.

1

Defendants do not dispute that DiPippo adequately pleaded § 1983 and state law claims against Stephens, Castaldo, and Quick for their extraordinary misconduct: fabricating witness statements and other evidence. But, they argue, despite the breadth of misconduct in this investigation, and the similar misconduct in the Deskovic case, that these were isolated acts for which the County and its supervisors cannot be held liable. In particular, Defendants target DiPippo's *Monell* claim against Putnam County, his supervisory liability claim against former Putnam County Sheriff Robert Thoubboron, and his claim against Defendant Victor Nestor, a corrections officer who falsely reported that DiPippo had made incriminating statements.

But, based on the scope of DiPippo's allegations, it is *plausible* that Stephens, Castaldo, and Quick worked in an environment that condoned and encouraged their coercive interrogations. DiPippo has pleaded a *Monell* claim based on three independent theories—that the Putnam County Sheriff's Department (PCSD) had a persistent and widespread practice of coercive interrogations; that the PCSD failed to supervise Stephens, Castaldo, and Quick despite notice of their misconduct; and that Sheriff Thoubboron, as the final policymaker, endorsed their actions. Thoubboron should be held personally liable based on his failure to supervise or discipline Stephens despite knowledge of his misconduct in this case, and for appointing Stephens to head the investigation specifically because of his history of securing false evidence. And Nestor shares liability with the other individual Defendants both as a co-conspirator and for his own fabrication of false evidence. Although it is certainly possible that discovery will prove that Stephens, Castaldo, and Quick acted on their own, DiPippo should be given the opportunity to prove his claims. The motion to dismiss should be denied.

2

<u>ALLEGATIONS</u>

**Howard Gombert rapes and murders Josette Wright.**

In October 1994, serial rapist Howard Gombert kidnapped 12-year-old Josette Wright after promising her a babysitting job. ¶¶ 28, 34, 36. Wright went missing for over a year before a hunter found her skeletal remains in the woods near Fields Lane in Patterson, New York. ¶ 31. Wright had been hogtied; her hands were bound behind her back to her leg and neck. Panties had been shoved down her throat, and a bra had been tied around her face. ¶ 32. She had been brutally raped and murdered.

Wright's rape and murder fit Gombert's pattern. Previously, Gombert had lured and raped at least four other young girls using the same brutal methods: binding their hands behind their backs and gagging them with underwear or other clothing. ¶ 35. He had also caused the disappearance of another young girl, and, although he was never prosecuted for it, police later found her underwear in a suitcase in his apartment. *Id.* Shortly after Wright's murder, Gombert was finally convicted of yet another rape—he had isolated yet another young girl in the woods, held her hands behind her back, shoved underwear in her mouth, and raped her. *Id.* He is currently incarcerated for that crime, but he was never prosecuted for Wright's rape and murder. ¶¶ 34, 38.

**Sheriff Thoubboron orders Stephens to close the investigation quickly.**

The discovery of Wright's body dominated the news in a municipality with one of the lowest crime rates in the nation. ¶ 39. It also endangered the reelection prospects of PCSD Sheriff Robert Thoubboron, who knew he needed quick arrest to reassure his voters. ¶ 40. To get one, Thoubboron placed Defendant Stephens in charge of the investigation, knowing that he would do whatever it took to close the case quickly. *Id.* Thoubboron also knew that in the past

Stephens had used sham polygraph examinations and physical, psychological, and emotional pressure to coerce confessions regardless of their truth. ¶¶ 40, 41.

**Stephens, Castaldo, and Quick use the same unconstitutional tactics to elicit or attempt to elicit false statements from at least six witnesses.**

### ***Dominick Neglia***

Three days after Wright's remains were discovered, police arrested Plaintiff, 18-year-old Anthony DiPippo, and his two teenaged friends, Andy Krivak and Dominick Neglia, after finding drugs in their car. ¶ 44. Sixteen-year-old Neglia, who was scared and wanted to go home, gave police a vague statement indicating that DiPippo and Krivak knew something about the murder. ¶¶ 44, 46. That tip got Neglia out of jail, but it was not enough to prosecute DiPippo or Krivak. ¶ 47. So, Stephens ordered his subordinates Castaldo and Quick to squeeze more out of Neglia. ¶ 48. For weeks, Castaldo and Quick pressured, threatened, and cajoled Neglia to develop evidence against DiPippo—visiting him night and day at high school, his home, and his work. ¶ 49. Eventually, Neglia succumbed, and told Castaldo and Quick what they wanted to hear: that DiPippo had confessed to raping and murdering Wright. ¶ 50. According to Neglia's false statement, DiPippo, Krivak, their friends Adam Wilson and Bill MacGregor, and a woman named "Patty" were driving Wright home from a party in DiPippo's Bronco when DiPippo and Krivak raped and murdered her. *Id.*

Neglia soon had misgivings and returned to the police station to retract his statement, but Castaldo struck Neglia in the back of the head with a pair of handcuffs and told him that he "didn't have any other choice" but to back up his statement. ¶¶ 51, 52. Terrified of further violence, Neglia agreed to help elicit a false confession from DiPippo. ¶ 54. Under Quick's orders, Neglia plied DiPippo with drugs to get him talking, but DiPippo never gave the confession Defendants wanted—because he was innocent. ¶¶ 54, 55. Neglia eventually soured on

4

the plan, gave a sworn recantation, and told Castaldo, Quick, and other PCSD officers that his statements implicating DiPippo had been coerced and false. ¶¶ 57, 59. Defendants misrepresented these statements in written reports and failed to document or disclose his recantations to them. ¶ 59.

### *Denise Rose*

Using the same methods, Stephens, Castaldo, and Quick coerced DiPippo's close friend Denise Rose—a highly susceptible 19-year-old with substance abuse problems—into falsely claiming to have witnessed DiPippo and Krivak rape and murder Wright. ¶ 65. Under Stephens's direction, Castaldo and Quick threatened to prosecute Rose for Wright's murder unless she implicated DiPippo and Krivak in the crimes. ¶¶ 65, 67. After Defendants fed her non-public details about the crime, including Neglia's false statement, and showed her Krivak's van (which Castaldo and Quick had decided was the vehicle used in the crime after learning that DiPippo did not own a Bronco in 1994), she falsely stated that she had been in Krivak's van with DiPippo, Krivak, Wilson, MacGregor, and Wright, but that she had not witnessed Wright's murder. ¶¶ 68–72.

This statement was not enough for Castaldo and Quick, who threatened her with prosecution if she did not change her story to claim that she saw the murder. ¶ 73. Days later, when she had not, she was arrested and charged with felony criminal mischief and a DWI—charges carrying seven and a half years in prison. ¶¶ 74–75. To avoid that fate, she changed her story and told police that she had witnessed Krivak and DiPippo rape Wright in Krivak's van, bind her hands in front of her body with rope, stuff a bra in her mouth, and leave her body in the woods near Fields Lane. ¶ 80. The details of her story originated with Castaldo and Quick, not Rose, and one of them turned out to be completely false—later forensic testing showed that

Wright had been hogtied with her hands behind her back, not in front of her as Rose claimed (and Castaldo and Quick believed at the time). ¶¶ 81–84. Castaldo and Quick never documented or disclosed that they threatened and coerced Rose, gave her promises of leniency, or fed her details about the crime to create the fabricated statement. ¶ 85, 87. Rose testified against DiPippo at all three of his trials. Her testimony was the only eyewitness account of his purported crimes, and her coerced statements led to his conviction twice. ¶ 92.

### *Adam Wilson*

Stephens, Castaldo, and Quick next turned their attention to Adam Wilson, DiPippo's teenaged friend whom Neglia and Rose had named. Together, they interrogated Wilson for between 12 and 15 hours without letting him go, denied him a lawyer, and refused to let him speak with his mother or his probation officer. ¶ 95, 96. When Wilson refused to sign a statement implicating DiPippo, even after he was threatened with prosecution, Stephens administered a sham polygraph examination designed to induce Wilson to falsely implicate his friend. ¶¶ 99–103. As he had done with Deskovic, Stephens falsely told Wilson that he failed the polygraph examination. ¶ 103. Wilson caved under this pressure: he signed a statement prepared by Quick falsely claiming that he had witnessed DiPippo rape and murder Wright. ¶ 104. The next morning, Wilson called his probation officer and told him that he had given a false statement to police after more than 12 hours of interrogation. ¶¶ 107, 108. His family hired a lawyer to prevent further harassment from Defendants, but Castaldo and Quick continued to show up at Wilson's house and enlisted a friend to induce him to retract his recantation. ¶¶ 108, 109. Wilson refused, and testified for the defense at DiPippo's 1997 trial. ¶¶ 109, 110.

### *Bill MacGregor*

Defendants Castaldo and Quick also coerced a false statement from Bill MacGregor, a teenaged drug user whom Neglia and Rose had named as a bystander. MacGregor was brought to the PCSD against his will, and Castaldo and Quick interrogated him for hours without allowing him to leave. ¶¶ 111–13. After he truthfully denied knowing Wright or witnessing her murder, Castaldo and Quick threatened to prosecute him for Wright's rape and murder unless he signed a prewritten statement falsely stating that he had witnessed the crimes. ¶¶ 114–18. Castaldo and Quick placed MacGregor in a room with Rose, who fed him their story. ¶ 120. Under the threat of prosecution and believing that he could not leave the police station unless he implicated DiPippo and Krivak, MacGregor signed a statement prepared by Castaldo and Quick claiming that he had been in Krivak's van with DiPippo, Krivak, Rose, Wilson, and Wright but had passed out and did not know what happened. ¶¶ 121, 122. He testified against DiPippo at his 1997 trial, but later recanted his false statement and testified for the defense at the 2012 trial. ¶¶ 123, 124.

### *Andrew Krivak*

After Krivak's arrest for the rape and murder of Wright, Stephens administered a sham polygraph examination with the singular purpose of getting Krivak to confess, regardless of his innocence. ¶ 133. As he had with Deskovic and Wilson, Stephens used a mix of suggestion, psychological and emotional coercion, and physical intimidation to elicit a false confession from Krivak. *Id.* At the conclusion of the examination, Stephens falsely told Krivak that he had not done well. *Id.* After hours of additional, coercive interrogation—including physical assault— Krivak signed a false statement consistent with Defendants' fabricated story, in which he admitted to participating in Wright's rape and murder. ¶¶ 134–36. Krivak's statement included many of the same non-public details Defendants had provided to Rose, including that Wright's

hands were tied with rope and underpants were stuffed in her mouth. ¶ 136. Krivak later recanted

his confession, reported that it had been coerced, and declared that he and DiPippo were

innocent. ¶ 137. Like DiPippo, however, he was convicted for the crime. ¶ 138.

### *Michael Moynihan*

Using the same tactics, Castaldo attempted to coerce DiPippo's friend Michael Moynihan

into falsely implicating DiPippo in the crimes. After PCSD officers arrested Moynihan, Castaldo

promised that pending charges for DWI and criminal mischief would go away if he signed a

statement stating that he had seen DiPippo and Krivak with Wright on the night she disappeared.

¶¶ 126–28. Moynihan refused to sign the statement, and he was convicted of DWI. ¶¶ 129, 130.

### Additional Witnesses

Castaldo and Quick also pressured at least four witnesses to recant statements that they

had seen Wright alive after October 3, which contradicted Rose's story. ¶ 161. Just as they had

with other witnesses, Castaldo and Quick used a combination of threats and harassment to induce

those witnesses to sign prewritten statements that accorded with Defendants' theory of the crime.

¶¶ 161–71.

**Defendant Victor Nestor fabricates a jailhouse confession.**

Castaldo and Quick worked with Defendant Victor Nestor, a corrections officer with the

Putnam County Sheriff's Department, to fabricate a false inculpatory statement attributed to

DiPippo. Nestor falsely claimed in a written report prepared in Quick's presence that DiPippo

had admitted he was present at the time of Wright's murder but that he had been high and could

not remember anything. ¶ 173. Nestor's false statement mirrored a statement Castaldo and Quick

had obtained from Scott Chestnut, a heroin addict and jailhouse snitch, who had been promised a

more favorable housing placement in exchange for inculpatory evidence against DiPippo. ¶ 172.

Nestor testified to this fabricated admission at all three of DiPippo's trials, including the 2016 trial after which DiPippo was acquitted. ¶ 173.

**DiPippo is tried and convicted in 1997 and 2012—and finally acquitted in 2016.**

In 1997, after hearing fabricated evidence from Rose, MacGregor, Nestor, and others, a jury convicted DiPippo of raping and murdering Wright. ¶¶ 173–75. Between 1997 and 2011, DiPippo continually protested his innocence, filing numerous challenges to his conviction. ¶ 177. While incarcerated, he learned that his first defense attorney had previously represented Howard Gombert against unrelated rape allegations and thus had a conflict of interest. ¶ 178. In 2011, on that basis, the Supreme Court, Appellate Division, vacated DiPippo's conviction and ordered a new trial. ¶ 179. During the second jury trial, the trial court refused to admit evidence of Gombert's guilt, and DiPippo was again convicted for Wright's rape and murder—based on the fabricated testimony of Rose, Nestor, and others. ¶ 173, 180.

After DiPippo returned to prison, new evidence of his innocence emerged. DNA testing of Krivak's van failed to detect any trace of Wright's DNA—even though she had supposedly been brutally raped and murdered there by two men twice her size. ¶ 182. After video footage came to light of Castaldo beating and possibly kicking a subdued, shackled prisoner, the Putnam County District Attorney Adam Levy began reinvestigating DiPippo's conviction. ¶ 183. DA Levy and the New York State Office of the Attorney General discovered evidence that Castaldo had tampered with witness testimony and withheld evidence from DiPippo's defense—including notes from an investigation of one of Gombert's other victims ¶¶ 184–91. DA Levy and an Assistant Attorney General also interviewed Rose and concluded that Castaldo had shown her much of the evidence in the Wright homicide and had met with her repeatedly to shape her false

statement. ¶ 190. Rose admitted that Castaldo and Quick had threatened her with prosecution if she refused to testify against DiPippo. ¶ 191.

In March 2016, the Court of Appeals reversed DiPippo's 2012 conviction, ruling that evidence of Gombert's involvement should have been admitted. ¶ 194. DA Levy had lost reelection, however, and Putnam County's new district attorney decided to reprosecute DiPippo based on Defendants' continuing misrepresentations and using largely the same false evidence as presented at the 2012 trial. ¶¶ 192, 195. This time, however, DiPippo's defense could introduce evidence about Howard Gombert's culpability—and Denise Rose's admissions to DA Levy— and, after a nearly monthlong trial, the third jury acquitted DiPippo. ¶¶ 196, 197. He had spent more than 20 years wrongfully incarcerated. ¶ 197.

He now sues for the damages caused by Defendants' unconstitutional misconduct, alleging, among other things, that Putnam County had an unconstitutional pattern or practice of coercing false witness statements through sham polygraph examinations, threats of prosecution, and physical and psychological intimidation, that Defendant Thoubboron has supervisory liability because of his oversight of his subordinates, and that Defendant Nestor's false statements to Castaldo and Quick were a cause of DiPippo's conviction.

## LEGAL STANDARD

A Rule 12(b)(6) motion must be denied if the complaint includes "enough facts to state a claim to relief that is plausible on its face," that is, enough factual allegations, taken as true, "to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007); *see also Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (applying *Twombly*). "[I]n determining whether a complaint states a claim that is plausible, the court is required to proceed 'on the assumption that all the [factual] allegations in the complaint

are true,' [e]ven if their truth seems doubtful." *Anderson News, LLC v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012) (quoting *Twombly*, 550 U.S. at 555). "Given that the plausibility requirement 'does not impose a probability requirement at the pleading stage . . . a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable, and that a recovery is very remote and unlikely.'" *Id.* (quoting *Twombly*, 550 U.S. at 556).

The Court must construe the complaint liberally and accept all facts alleged on information and belief when they are "peculiarly within the possession and control of the defendant, or where the belief is based on factual information that makes the inference of culpability plausible," *Arista*, 604 F.3d at 120 (citations omitted); *see also Keiler v. Harlequin Enters. Ltd.*, 751 F.3d 64, 71 (2d Cir. 2014) (similar). Direct evidence of a defendant's intent, motive, or knowledge is rarely available to plaintiffs before discovery, and "[i]t is sufficient to allege facts from which [the relevant mental state] on the part of the defendants reasonably may be inferred." *Safepath Sys. LLC v. N.Y.C. Dep't of Educ.*, 563 F. App'x 851, 857 (2d Cir. 2014) (internal quotation marks omitted).

## ARGUMENT

### I.     DiPippo pleaded a plausible *Monell* claim under three different legal theories.

DiPippo's conviction resulted from a series of police interrogations in which PCSD officers threatened witnesses with prosecution, subjected witnesses to sham polygraph examinations, or both in order to obtain false evidence inculpating DiPippo in Wright's murder. These witness interviews were not isolated incidents; they were the standard operating procedure of PCSD officers for quickly solving high-profile homicides. This unofficial practice was encouraged by supervisors, including Defendant Dan Stephens, who personally conducted many

11

of the coercive interrogations. In fact, Sheriff Thoubboron personally assigned the Wright homicide investigation to Stephens knowing that he would use these techniques. And when the witnesses reported the misconduct—even testifying to it under oath—the PCSD did nothing to supervise or discipline its officers. As a result, DiPippo was convicted twice of a rape and murder he did not commit.

Defendants argue that DiPippo has not pleaded enough prior examples of similar unlawful conduct to support a *Monell* claim. But DiPippo has shown the pervasive use of coercive interrogation practices *in this very case*, which, especially when coupled with Defendant Stephens's strikingly similar misconduct in the Deskovic case, is more than enough to plead a *Monell* claim. Furthermore, his claim can survive under two additional, independent legal theories: Putnam County failed to supervise and discipline its officers despite the cascade of complaints about coercive interrogations; and Sheriff Thoubboron, as the PCSD's final policymaker, authorized the individual Defendants' misconduct. Under each of those three theories of liability, DiPippo is entitled to discovery on his *Monell* claim.[1]

### A.   The PCSD had an unofficial policy of coercing witness statements in high-profile homicide investigations.

Under *Monell*, a municipality can be held directly liable for constitutional violations when "the municipality itself caused or is implicated in the constitutional violation." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 124–25 (2d Cir. 2004). To prove a *Monell* claim, a plaintiff must show that (1) an action or inaction attributable to the City, (2) taken with deliberate indifference to the risk that constitutional violations would result, (3) caused the violations of plaintiff's rights. *See id*. at 124–27; *Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d

---

[1] Of course, dismissing the *Monell* claim at this stage would not simplify discovery because evidence regarding Putnam County's supervision and discipline of Defendant Stephens, as well as its lengthy history of civil rights abuses, will be relevant to the individual Defendants' mens rea, a necessary element of all of Plaintiff's claims.

415, 439–40 (2d Cir. 2009). A municipality is always liable when its official policy is

unconstitutional, but it can also be liable when a pervasive *unofficial* policy results in

constitutional harm. A practice that is so "persistent and widespread" as to constitute a custom or

usage with the force of law or a practice that is "so manifest as to imply the constructive

acquiescence of senior policy-making officials" can be challenged under *Monell*. *Sorlucco v.

New York City Police Dept.*, 971 F.2d 864, 870–71 (2d Cir. 1992). A plaintiff can rely on

"evidence of misconduct with strong similarities" to establish a widespread practice. *Hunter v.

City of New York*, 35 F. Supp. 3d 310, 324 (E.D.N.Y. 2014).

DiPippo has already pleaded six instances in this investigation alone where Defendants

Stephens, Castaldo, and Quick conducted improper interrogations of vulnerable teenagers to

obtain evidence against DiPippo. These witnesses included:

- **Dominick Neglia**, who was offered leniency in exchange for implicating DiPippo and who was harassed and assaulted in an effort to develop more and better information, ¶¶ 44–59;

- **Denise Rose**, a 19-year-old drug addict, who was threatened with prosecution if she did not acquiesce and adopt Defendants' manufactured story of DiPippo's involvement in the Wright murder based on details fed to her by Defendants, ¶¶ 65–92;

- **Adam Wilson**, who was interrogated for more than 12 hours, denied a lawyer, given a sham polygraph examination, falsely told that he failed, and threatened with prosecution if he did not sign a statement prepared by Defendants claiming that he saw DiPippo rape and murder Wright, ¶¶ 95–110;

- **Bill MacGregor**, a teenaged drug user, who was interrogated for hours, threatened with prosecution if he did not sign a prewritten statement implicating DiPippo in the Wright murder, and fed details of the crime, ¶¶ 111–24;

- **Andrew Krivak**, who was given a sham polygraph examination, falsely told that he failed, and assaulted until he signed a false confession implicating himself and DiPippo in Wright's murder, including many of the same non-public details fed to Rose, ¶¶ 133–38; and

- **Michael Moynihan**, who was offered leniency if he would sign a statement claiming that

he had seen DiPippo with Wright on the night of her disappearance and later prosecuted
when he refused to do so, ¶¶ 126–30.

Surely, the similarity of these interrogations, conducted openly over the course of months in a

small county sheriff's office investigating an unusually high-profile homicide, could have been a

coincidence. But, more plausibly, these similarities suggest an accepted practice of conducting

coercive interrogations in homicide investigations. Coupled with DiPippo's allegations that

Castaldo and Quick induced at least four witnesses to withdraw exculpatory statements and

Stephens's notoriety from the 1990 Deskovic case—in which he used a sham polygraph and

other coercion to force a teenage boy to falsely confess to the murder of a young girl—this

pattern suggests an environment where misconduct was tolerated or encouraged. ¶¶ 3–5, 23,

161–71. And while it is surely *possible* that discovery will prove that Stephens, Castaldo, and

Quick's misconduct went undetected despite the small size of the PCSD and the importance of

the investigation to Sheriff Thoubboron personally, it is at least *plausible* that they acted with

"the constructive acquiescence of senior policy making officials." *Sorlucco*, 971 F.2d at 871.

That is all DiPippo must show at this stage.

Defendants argue that DiPippo has not pleaded enough *examples* of unlawful conduct to

pass the plausibility threshold. But courts have allowed *Monell* claims to proceed to discovery

with just as many or even fewer examples. *See, e.g.*, *Ferrari v. Cnty. of Suffolk*, 790 F. Supp. 2d

34, 46 (E.D.N.Y. 2011) (three instances (including Plaintiff's own claim)); *Reyes v. County of

Suffolk,* 995 F. Supp. 2d 215, 231 (E.D.N.Y. 2014) (more than three); *Castilla v. City of New

York*, No. 09 Civ. 5446(SHS), 2012 WL 3871517, at **4–5 (S.D.N.Y. Sept. 6, 2012) (a "string

of incidents" over time involving similar misconduct against plaintiff and others); *Colon v. City

of New York*, 09-cv-8 (JBW) 2009 WL 4263362, at *1 (E.D.N.Y. Nov. 25, 2009) (six instances);

*Tyus v. Newton*, 13-cv-1486 (SRU), 2015 WL 1471643, at *11 (D. Conn. Mar. 31, 2015) (three

14

incidents against the plaintiff and one against a third party).

DiPippo has already pleaded a pattern of *eleven* coercive or suggestive witness interviews—far more than many other cases that have proceeded to discovery. Plaintiff fully expects to develop still further examples of coercive interrogation and hard evidence of institutional support for them. *See Osterhoudt v. City of New York*, 10-cv-3173, 2012 WL 4481927, at *1 (E.D.N.Y. Sept. 27, 2012) ("[I]n the context of Rule 12, where plausibility is in issue, it is hard to ignore these cases, which suggest that the conduct complained of is not limited to the four corners of [the plaintiff's] complaint"). The Court should allow DiPippo's claim to proceed to discovery.

### B.    PCSD failed to supervise its investigators during the original investigation and before the 2012 trial.

DiPippo's complaint alleges a second theory of *Monell* liability: failure to properly supervise PSCD officers despite widespread, and well-known, investigatory misconduct. "The failure to train or supervise city employees may constitute an official policy or custom if the failure amounts to deliberate indifference to the rights of those with whom the city employees interact." *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007). Such deliberate indifference "may be inferred where the need for more or better supervision to protect against constitutional violations was obvious, but the policymaker failed to make meaningful efforts to address the risk of harm to plaintiffs." *Cash v. Cnty. of Erie*, 654 F.3d 324, 334 (2d Cir. 2011) (internal quotation marks and citations omitted). "An obvious need may be demonstrated through proof of repeated complaints of civil rights violations; deliberate indifference may be inferred if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents." *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995). "[T]he very assertion of a number of such claims put[s] the City on notice that there

was a possibility that its officers had [violated the Constitution]." *Fiacco v. City of Rensselaer*, 783 F.2d 319, 328 (2d Cir. 1986). Further, "the means of establishing deliberate indifference will vary given the facts of the case," and the Court must consider plaintiff's allegations "as a whole rather than as a series of unconnected acts." *Amnesty Am.*, 361 F.3d at 128–29.

Defendants claim that the County was not on notice of the need to supervise and discipline Stephens, Castaldo, and Quick, but Plaintiff's complaint suggests otherwise. Plaintiff pleaded that the witnesses subjected to Defendants' misconduct brought a steady stream of complaints to the attention of the PCSD. Neglia immediately recanted his statement, contacted the PCSD to report that it was false, and testified at trial that he had been made to lie. ¶¶ 57–59. After he had been coerced by Stephens's sham polygraph, Wilson called his probation officer, his family hired a lawyer to protect his rights, and he too publicly renounced his false statement. ¶¶ 107–10. Similarly, Krivak reported that his false confession had been coerced during Stephens's sham polygraph examination. ¶ 137.

Although their claims were unproven at the time, further investigation has shown that these witnesses were telling the truth—their statements had been coerced—a fact that this Court must accept as true at this stage. That suggests two plausible alternatives: *either* the PCSD failed to investigate these claims—and thereby failed to uncover the coercion—*or* the PCSD was fully aware of the misconduct and chose to take no action. Under either alternative, the PCSD "failed to make meaningful efforts to address the risk of harm" to DiPippo, *Cash*, 654 F.3d at 334, and his *Monell* claim should go forward, *see, e.g.*, *H.H. v. City of New York*, 11-cv-4905 (NG) (ST), 2017 WL 3396434, at *8 (E.D.N.Y. Aug. 7, 2017) ("Unsubstantiated allegations may form the basis of a deliberate indifference claim where there is evidence to suggest that the investigation into the allegations was inadequate."); *Fiacco*, 783 F.2d at 328 ("The fact that none of the claims

16

had yet been adjudicated in favor of the claimant was not material; if the City's efforts to evaluate the claims were so superficial as to suggest that its official attitude was one of indifference to the truth of the claim, such an attitude would bespeak an indifference to the rights asserted in those claims.")

Further, these stories of coercive interrogations and sham polygraph examinations should have been deemed plausible by PCSD officials familiar with Stephens's reputation and modus operandi. ¶¶ 23, 41. "Even where the need to train or supervise would not be obvious to a stranger to the situation, a particular context might make the need for training or supervision so obvious that a failure to do so would constitute deliberate indifference." *Walker v. City of New York*, 974 F.2d 293, 297 (2d Cir. 1992); *see also H.H.*, 2017 WL 3396434, at *9 (finding that the City "should have paid particular attention" to allegations against an officer whom supervisors knew to pose "a heightened risk of corruption."). So here. Stephens's reputation for obtaining confessions by using physical, psychological, and emotional pressure, including during the Deskovic investigation, should have made it obvious to PCSD supervisors that the steady thrum of complaints was not idle chatter. Instead of supervising or disciplining Stephens, however, the PCSD let him supervise the Wright investigation and empowered him to cause DiPippo's wrongful conviction.

Putting aside Plaintiff's sufficient allegations of notice at the time of the original investigation, there is no question that the County was on notice of Stephens's pattern of investigative misconduct by the time of DiPippo's second conviction in 2012. Jeffrey Deskovic filed his federal civil rights lawsuit in 2007, after being exonerated in November 2006, and he alleged that Stephens elicited a false confession in strikingly similar circumstances as this case. *See Deskovic v. City of Peekskill*, 894 F. Supp. 2d 443, 448–50 (S.D.N.Y. 2012). Yet Defendants

did nothing.[2] Despite having ample opportunity to reassess evidence the County had reason to know was tainted by Stephens's investigative misconduct—and to correct the errors that led to DiPippo's first wrongful conviction—the County deliberately ignored its supervisory responsibilities and allowed DiPippo to be wrongly tried and convicted a second time. The County's failure to reassess the evidence against DiPippo in light of Deskovic's exoneration and civil rights case suggests that the County either turned a blind eye to Stephens's coercion or deliberately covered up known misconduct.

The County's failure to train Stephens, Castaldo, and Quick allowed them frame DiPippo for Wright's rape and murder. A municipality cannot condone police officers who use their power "in a way that is itself lawless," and "should not take a laissez-faire attitude toward the violation by its peace officers of the very rights they are supposed to prevent others from violating." *Fiacco*, 783 F.2d at 327. For that reason, DiPippo's failure-to-supervise *Monell* claim should survive the motion to dismiss.

**C.      Sheriff Thoubboron, the final policymaker, solicited Stephens's misconduct.**

DiPippo has also stated a viable *Monell* claim based on Sheriff Thoubboron assigning Stephens to oversee the Wright investigation knowing that he would use unconstitutional methods to procure a conviction.

Even one action by an official with "final authority to establish municipal policy with respect to the action ordered" is sufficient to establish a *Monell* claim. *Amnesty Am.*, 361 F.3d at 126. Whether an official possesses final policymaking authority is determined by state law. *See*

---

[2] Contrary to Defendants' argument, it is immaterial that no verdict had been entered against Stephens by 2012, when DiPippo's second trial began. *See, e.g.*, *Edwards v. City of New York*, No. 14-CV-10058 KBF, 2015 WL 5052637, at *7 n.3 (S.D.N.Y. Aug. 27, 2015) ("The point here is one of notice. Civil suits filed [before the misconduct] are relevant here not because they prove that such [misconduct] actually occurred, but rather because they support the inference that the City was aware of the possible [misconduct].").

*Jeffes v. Barnes*, 208 F.3d 49, 57 (2d Cir. 2000). As DiPippo pleaded—and Defendants do not dispute—Sherriff Thoubboron was the final policymaker for the PCSD. ¶ 27.

DiPippo's complaint alleges that Sheriff Thoubboron knew about Stephens's history of coaxing confessions out of innocent people by exploiting the physical, psychological, and emotional pressure points that cause suspects to confess—that is the reason why he assigned Stephens to investigate the Wright murder. ¶¶ 40–41. Moreover, Stephens updated Thoubboron throughout the investigation, and he knew about every major investigatory development. ¶ 144. These reports put Thoubboron on notice of Defendants' misconduct, yet he did nothing to stop DiPippo's prosecution and conviction. *Id.* As the final policymaker, Sheriff Thoubboron bound the County to Defendants' unconstitutional misconduct, and DiPippo's complaint stated a *Monell* claim on this basis alone.

## II.    DiPippo pleaded a plausible supervisory liability claim against Sheriff Thoubboron.

Next, Defendants object to the District Court's ruling that the supervisory claims could proceed to limited discovery. They do not dispute that supervisors may be held liable in theory, they merely challenge the sufficiency of the factual allegations. Given the plausible allegations that the individual Defendants violated DiPippo's rights by fabricating evidence against him, the lone question is whether the Complaint plausibly pleads the personal involvement of Sheriff Thoubboron in this misconduct. A plaintiff may establish such personal involvement by making any one of five showings (the "*Colon* factors"):

> (1) the defendant participated directly in the alleged constitutional violation,
> (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong,
> (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom,
> (4) the defendant was grossly negligent in supervising subordinates

> who committed the wrongful acts, or
> (5) the defendant exhibited deliberate indifference to the rights of
> [the plaintiff] by failing to act on information indicating that
> unconstitutional acts were occurring.

*Warren v. Pataki*, 823 F.3d 125, 136 (2d Cir. 2016) (quoting *Colon v. Coughlin*, 58 F.3d 865,

873 (2d Cir. 1995)).[3]

The Complaint alleges, with abundant support, that the investigation of Wright's murder

drew the attention of Sheriff Thoubboron, who was worried about high-profile investigation on

the eve of an election. ¶ 40. Thoubboron selected Stephens to lead the investigation knowing his

reputation for using coercive and unlawful tactics to obtain evidence through interrogation.

¶¶ 40–41. Although Thoubboron may not have been personally present during any of the

interrogations (and at this pre-discovery stage, Plaintiff cannot say so for sure), he was kept

abreast of developments in the case, given its importance to his political prospects. ¶ 144.

It is plausible that Thoubboron learned of Stephens's coercive methods—or of the myriad

complaints concerning his interrogation—during those updates. Of course, it is also *possible* that

Stephens lied to Thoubboron regarding certain critical details. Should discovery reveal that

Thoubboron was not personally involved, DiPippo will voluntarily dismiss any claims against

him. But given that the particular facts of each individual Defendant's involvement are uniquely

within Defendants' control, DiPippo is not required to provide specifics he could not possibly

obtain before discovery. *See Arista*, 604 F.3d at 120. At this stage, it is enough to allege facts

sufficient to support the plausible inference that Thoubboron personally encouraged Stephens's

misconduct, or, despite knowing about that misconduct, he did nothing.

---

[3] Although some district courts have questioned the continued validity of the *Colon* factors following the Supreme Court's decision in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), *see e.g.*, *Allah v. Annucci*, 16-cv-1841 (KMK), 2017 WL 3972517, at *6 (S.D.N.Y. Sept. 7, 2017), this Court has recently concluded that "all five categories under *Colon* are still valid unless and until the Second Circuit holds otherwise…," *Corbett v. Annucci*, 16-cv-4492 (NSR), 2018 WL 919832, at *6 n.5 (S.D.N.Y. Feb. 13, 2018).

### III.    DiPippo's fabrication claim against Defendant Nestor should go forward.[4]

Defendants wrongly seek to dismiss the fabrication claim against Defendant Victor Nestor, a PCSD corrections officer who falsely claimed that DiPippo made inculpatory statements in jail. But, as the Second Circuit has repeatedly held, "[w]hen a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages...." *Ricciuti v. N.Y.C. Tr. Auth.*, 124 F.3d 123, 130 (2d Cir. 1997); *see also Garnett v. Undercover Officer C0039*, 838 F.3d 265, 279–80 (2d Cir. 2016) (holding that a fabrication claim requires showing that "the officer created false information, the officer forwarded the false information to prosecutors, and the false information was likely to influence a jury's decision.").

In moving to dismiss the claims against Nestor, it is notable what the Defendants *do not* argue. They do not challenge the plausibility of DiPippo's allegations that Nestor fabricated a false inculpatory statement, forwarded that statement in oral and written form to the prosecutors, and thereby helped cause DiPippo's wrongful conviction.[5] *See* ¶¶ 172–73. Nor do they, or can they, challenge the fact that Nestor was acting under the color of state law, as required by § 1983. As DiPippo pleaded, Nestor was employed by the PCSD and acting within the scope of his duty when he fabricated the statement. ¶ 26. Instead, Defendants claim that *Ricciuti*'s crystal

---

[4] DiPippo also pleaded a § 1983 conspiracy claim against Nestor that Defendants do not challenge here. Thus, even assuming that DiPippo's fabrication claim against Nestor is not well-pleaded (it is), he should not be dismissed as a Defendant.

[5] Defendant Nestor is not shielded by absolute immunity for his misconduct. The absolute immunity that protects court testimony does not extend to written reports or statements made to the district attorney, which are "independently actionable under § 1983." *Coggins v. Buonora*, 776 F.3d 108, 113 (2d Cir. 2015). As DiPippo has pleaded, Nestor memorialized his false statements in an affidavit that was sent to the prosecution before he gave any court testimony against DiPippo. That false evidence is "independently actionable" even if his actual trial testimony is not. *Id.*

clear proscription against government fabrication of evidence does not apply to Nestor because he was not acting as an "investigator." The Second Circuit's case law contains no such proviso, and DiPippo's claim against Nestor should proceed.

Sternly warning against efforts to "erect a legal barricade to shield police officials from liability," *Ricciuti* spoke plainly about law enforcement's "responsibilities…toward the citizenry in an open and free society":

> No arrest, no matter how lawful or objectively reasonable, gives an arresting officer *or his fellow officers* license to deliberately manufacture false evidence against an arrestee. To hold that police officers [are] free to fabricate false confessions at will, would make a mockery of the notion that Americans enjoy the protection of due process of the law and fundamental justice…. [A] police officer's fabrication and forwarding to prosecutors of known false evidence works an unacceptable corruption of the truth-seeking function of the trial process.

*Ricciuti*, 124 F.3d at 130 (internal quotation marks omitted) (emphasis added). *Ricciuti* applies to all police officials, not just arresting officers, and its clarion language allows no room for the quibbling functional analysis Defendants ask this Court to perform.

Moreover, Nestor's misconduct in collecting evidence was squarely investigatory, and, as courts around the country have found, fabrication claims should proceed against *any* government official—not just investigating police officers—who fabricate evidence and forward it to the prosecution. *See, e.g.*, *Ying Li v. City of New York*, 246 F. Supp. 3d 578, 629 (E.D.N.Y. 2017) (fabrication claim against a doctor whose false findings were used to prosecute plaintiff in a child's death); *Gregory v. City of Louisville*, 444 F.3d 725, 740 (6th Cir. 2006) (finding that forensic examiners are liable for falsifying forensic reports); *Pierce v. Gilchrist*, 359 F.3d 1279, 1300 (10th Cir. 2004) (same); *Brown v. Miller*, 519 F.3d 231, 237 (5th Cir. 2008) (holding "there is no reason a government scientific expert should enjoy immunity greater than that of other

investigators"); *Johnson v. Han*, 14-cv-13274-IT, 2015 WL 4397360, at *8 (D. Mass. July 17, 2015) ("The court sees no reason to distinguish between a forensic report used to support probable cause and a drug-analysis report used to support conviction."). The Court should reject Defendants' attempt to provide immunity for corrections officers who fabricate evidence.

Because DiPippo alleged that Nestor sent the prosecution written and oral reports falsely claiming that DiPippo had made incriminating statements—evidence that was likely to make a jury conclude he was guilty—DiPippo's fabrication claim against Nestor should go forward. ¶ 173.

## IV.    DiPippo's failure to intervene claims are pleaded in the alternative.

Citing inapplicable precedent, Defendants argue that DiPippo's failure to intervene claims must be dismissed because he has failed to specify which Defendants participated in the unlawful conduct and which failed to intervene—and that this inconsistency is fatal. But Rule 8 specifically authorizes alternative pleading and allows a plaintiff to "state as many separate claims or defenses as it has, regardless of consistency." Fed. R. Civ. P. 8(d)(3). At this early stage, DiPippo should be permitted to plead his claims in the alternative.

There is no question that police officers have "an affirmative duty to intercede on behalf of a citizen whose constitutional rights are being violated in his presence by other officers." *Ricciuti*, 124 F.3d at 129 (internal quotation marks omitted). And, while a single defendant cannot be held liable for both *committing* unconstitutional misconduct *and* failing to intervene in that misconduct, a plaintiff may *plead* both theories. *See, e.g.*, *Guerrero v. City of New York*, 16-cv-516 (JPO), 2017 WL 2271467, at *4 (S.D.N.Y. May 23, 2017) ("Though a failure to intervene theory of liability is inapplicable where a defendant is a direct participant in the alleged primary violation, at this stage, these two claims may be pleaded in the alternative."); *Bucy v.*

*City of White Plains*, 14-cv-1806 (VB), 2015 WL 8207492, at *3 (S.D.N.Y. Dec. 7, 2015) (allowing an alternative theory of failure to intervene even at summary judgment); *Cumberbatch v. Port Auth. of N.Y. & N.J.*, 03-cv-749 (BSJ), 2006 WL 3543670, at *11 (S.D.N.Y. Dec. 5, 2006) (similar).

Defendant's case law does not contradict this basic principle of civil procedure. In *Ying Li*, the court dismissed a failure to intervene claim where "Plaintiff's allegations are merely conclusory" and "do not give any of the Defendants fair notice of what Plaintiff's claim is and the grounds up which it rests." 246 F. Supp. 3d at 619–620. The problem, in other words, was not that the plaintiff was pleading in the alternative; it was that the plaintiff's allegations were not specific enough to determine which defendants should have intervened and when.

DiPippo's complaint does not suffer from that problem. DiPippo has pleaded that Stephens, Castaldo, and Quick were each present during multiple coercive interrogations. ¶¶ 44–59, 64–92, 95–110, 111–24, 133–38, 126–30. He cannot be faulted, pre-discovery, for not knowing which officer applied the coercion and which (if any) merely looked on. Similarly, at this early stage, DiPippo does not have access to discovery that would reveal whether Thoubboron directly ordered the misconduct or just took no action while his subordinates violated DiPippo's rights. ¶¶ 39–42. Finally, although Nestor took a direct role by fabricating evidence, he could also be held liable for failing to stop Quick from submitting his fabricated police report to the prosecution. ¶ 173.

## CONCLUSION

DiPippo has pleaded an extraordinary case of widespread police misconduct that would not be possible without the acquiescence of the PCSD and its leadership in encouraging or tolerating coercive interrogation techniques. His *Monell* and supervisory liability claims are

24

well-pleaded, and there are no legal grounds to dismiss the claims against Nestor or the failure to intervene claims. The motion should be denied.[6]

<div style="margin-left:40%">

Respectfully submitted,

June 14, 2018

 /s/ Richard Sawyer_____
Nick Brustin
Emma Freudenberger
Richard Sawyer
Meghna Philip*
Neufeld Scheck & Brustin, LLP
99 Hudson Street, Eighth Floor
New York, NY 10013
(212) 965-9081

Benjamin Brafman
Mark M. Baker
Marc Agnifilo
Brafman & Associates, P.C.
767 Third Avenue, 26th Fl.
New York, NY 10017
(212) 750-7800

*Attorneys for Plaintiff Anthony DiPippo*

*Admission pending to S.D.N.Y.

</div>

---

[6] Plaintiff agrees that Putnam County cannot be held directly liable for intentional infliction of emotional distress and voluntarily dismisses that claim with respsect to Putnam County only. Plaintiff also clarifies that, to the extent the Complaint suggests otherwise, he is not pursuing a freestanding 14th Amendment claim based on the Defendants' deliberate failure to conduct a constitutionally adequate investigation.

## CERTIFICATE OF SERVICE

I hereby certify that I delivered the foregoing *Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss* to all counsel of record by electronic mail on June 14, 2018.

Respectfully submitted,

/s/ Richard Sawyer

Richard Sawyer
*An attorney for Plaintiff Anthony DiPippo*

26