UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ANTHONY DiPIPPO.,

                Plaintiff,

   -against-

COUNTY OF PUTNAM; Putnam County Sheriff's
Department Sherriff ROBERT THOUBBORON in
his individual capacity; Putnam County Sheriff's
Department Investigators DAN STEPHENS,
PATRICK CASTALDO, BILL QUICK, and Putnam
County Sheriff's Department Officer VICTOR
NESTOR, in their individual capacities,

                Defendants.

17-cv-7948 (NSR)

OPINION AND ORDER

NELSON S. ROMÁN, United States District Judge

     Plaintiff Anthony DiPippo ("DiPippo" or "Plaintiff") brings this 42 U.S.C. Section 1983

action against County of Putnam ("Putnam"); Putnam County Sheriff's Department Sherriff

Robert Thoubboron ("Thoubboron"); Putnam County Sheriff's Department Investigators Dan

Stephens ("Stephens"), Patrick Castaldo ("Castaldo"), Bill Quick ("Quick"), and Putnam County

Sheriff's Department Officer Victor Nestor ("Nestor"), (collectively, "Defendants"), seeking

redress for alleged civil rights violations stemming from his 1997 and 2012 convictions for raping

and murdering 12-year-old Josette Wright. (*See* Complaint, ("Compl."), ECF No. 1.) A jury

acquitted Plaintiff after his third trial in 2016. Plaintiff served nearly 20 years in prison before his

acquittal. Plaintiff claims that Defendants violated his constitutional rights by maliciously

prosecuting him and depriving him of due process by denying him a fair trial. Plaintiff raises claims

of: malicious prosecution, fabrication, deprivation of liberty without due process, failure to

intervene, civil rights conspiracy, supervisory liability, *Monell* liability, respondeat superior

...IT
.RONICA...
.//:
.E FILED: 2|28|2019

liability, and intentional, reckless and negligent infliction of emotional distress.

Defendants Putnam, Thoubboron, and Nestor move to dismiss Plaintiff's Complaint, arguing that several claims fail to state a claim upon which relief may be granted. (Defendants' Motion to Dismiss, ECF No. 28.) Further, all Defendants move to dismiss Plaintiff's failure to investigate and emotional distress claims as a matter of law. (*See id*.) For the following reasons, Defendants' Motion to Dismiss is GRANTED in part and DENIED in part.

## FACTUAL BACKGROUND

The following facts are taken from Plaintiff's Complaint and are accepted as true for deciding the instant motion. The Court excludes facts that are irrelevant to the instant motion. In addition, the Court takes judicial notice of all facts that are not subject to dispute because they are generally known within the Court's territorial jurisdiction.[1]

### I.    THE PARTIES

#### A.  Anthony DiPippo

At all times relevant to this complaint, Plaintiff Anthony DiPippo was a resident of Dutchess County or Putnam County in the State of New York. On July 11, 1997, DiPippo was convicted for raping and murdering 12-year-old Josette Wright ("Wright"). After nearly two decades in prison, on October 11, 2016, DiPippo was released after the New York State Court of Appeals vacated DiPippo's conviction and a jury acquitted him. Consequently, DiPippo was released after spending nearly 20 years in prison for a horrendous crime that a jury later determined he did not commit. (Compl. ¶ 21.)

---

[1] When ruling on motions to dismiss under Rule 12(b)(6), courts must consider the complaint, "as well as documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 127 S. Ct. 2499 (2007); *Staehr v. Hartford Fin. Servs. Grp. Inc.*, 547 F.3d 406, 426 (2d Cir.2008). While consideration of matters outside the pleadings generally converts a motion to dismiss to a motion for summary judgment, consideration of facts for which judicial notice may be taken does not. *Apotex Inc. v. Acorda Therapeutics, Inc.*, 823 F.3d 51, 60 (2d Cir. 2016); Fed. R. Civ. P. 12(d).

**B. Putnam County**

Defendant Putnam works with the Putnam County Sheriff's Department ("PCSD"). The PCSD, along with New York State Police, provides primary law enforcement services for Putnam. (*Id*. ¶ 22.) For the times relevant to this Complaint, the PCSD has employed certain policies, practices, and customs that were the subject of numerous civil complaints. (*Id*.) Hence, in 2000, Governor George E. Pataki called for a state investigation and the New York State Legislature voted unanimously to authorize an independent state investigation of the PCSD due to the growing number of allegations that the department had abused its power and violated civil rights. (*Id*.)

**C. Dan Stephens**

Defendant Stephens was a duly appointed and acting investigator of the PCSD, working for Putnam and the State of New York. (*Id*. ¶ 23.) For the times relevant to this Complaint until 2000, Stephens was supervisor for the Bureau of Criminal Investigation and oversaw the investigation into Wright's rape and murder. (*Id*.) He now works as Putnam County Coroner. (*Id*.) Stephens supervised and participated in the investigation by, *inter alia*, interrogating suspected witnesses and administering polygraph tests to Adam Wilson and Andy Krivak. (*Id*.) Plaintiff sues Stephens in his individual capacity. (*Id*.)

**D. Patrick Castaldo**

Defendant Castaldo, was an officer with the PCSD, working for Putnam and the State of New York. (*Id*. ¶ 24.) Castaldo was a lead investigator on Wright's case, and it was allegedly his practice to coerce confessions from supposed witnesses, threaten and manipulate supposed witnesses, fabricate inculpatory evidence, and conceal exculpatory information to secure a conviction. (*Id*.) Castaldo retired from the PCSD in 2014. (*Id*.) In February 2015, Castaldo was indicted on a felony charge in an unrelated case after he failed to disclose his use of force on a

person in his custody the previous year. (*Id.*) In February 2017, Castaldo pled guilty to harassment in the second degree. (*Id.*) Plaintiff sues him in his individual capacity. (*Id.*)

### E. Bill Quick

Defendant Quick was an officer with the PCSD, working for Putnam and the State of New York. Along with Castaldo, he was a co-lead officer in the Wright investigation, and it was allegedly his practice to coerce confessions from supposed witnesses, threaten and manipulate supposed witnesses, fabricate inculpatory evidence, and conceal exculpatory information to secure a conviction. (*Id.* ¶ 25.) Plaintiff sues him in his individual capacity. (*Id.*)

### F. Victor Nestor

Defendant Nestor was, at all times relevant to this Complaint, a PCSD correction officer, working for Putnam and the State of New York. (*Id.* ¶ 26.) He allegedly conspired with Castaldo and Quick to give false evidence regarding an admission DiPippo purportedly made during DiPippo's pretrial detention. (*Id.*) Plaintiff sues him his individual capacity. (*Id.*)

### G. Sheriff Robert D. Thoubboron

Defendant Thoubboron is the former Sherriff who led PCSD and worked for Putnam and the State of New York for 16 years, from 1986 to 2001. (*Id.* ¶ 27.) Thoubboron was the PCSD's final policymaker from 1986 to 2001, including during the Wright investigation and DiPippo's first trial in 1997. (*Id.*) Hence, he was acquainted with the PCSD's policies, practices and customs. (*Id.*) Thoubboron was defeated in the 2001 election after a state commission concluded that he had abused his office by using it to punish his political enemies. (*Id.*) Plaintiff sues him in his individual capacity. (*Id.*)

## II.   FACTS

### A.  Josette Wright Disappears and her Body is Found One Year Later

On October 4, 1994, Wright's mother reported to the police that her 12-year-old daughter, a seventh grader at George Fischer Middle School in Carmel, New York, had been missing since the previous day. (*Id*. ¶ 28.) Wright's disappearance was big news in Putnam County, where her mother spread the word and enlisted help in hanging up posters with images of her missing blond-haired, blue-eyed preteen. (*Id*. ¶ 29.) Shortly after Wright's disappearance, a neighbor told police that she saw Wright on October 3, 1994, whilst driving home from work. (*Id*. ¶ 30.) The neighbor reported that Wright was standing at an intersection when a red car with Connecticut license plates stopped next to Wright. (*Id*.) The neighbor said Wright spoke to the driver, a man, and then climbed into the passenger seat beside him. (*Id*.)

Over a year later, on November 22, 1995, a local deer hunter found Wright's skeletal remains in Patterson, NY, in the wooded area of Fields Lane. (*Id*. ¶ 31.) Wright's body had decomposed such that the date of her death was, at the time, indeterminable. (*Id*. ¶ 32.) She was prone, face-down, on the forest floor. (*Id*.) Twigs and forest debris covered her exposed skeleton. (*Id*.) Based on forensic analysis, it was determined that a rope bound Wright's hands behind her back and circled her neck and one of her legs. (*Id*.) The bones in her right foot were broken. (*Id*.) Wright's underwear was stuffed in her throat, and her bra was tied around her face. (*Id*.) PCSD officers found Wright's white sneakers, brown jacket, and white t- shirt at the scene, as well as 35 cents, a pink Bic lighter, a photograph, and a blue hologram pendant. (*Id*. ¶ 33.)

### B.  Howard Gombert: The Suspect who was Never Prosecuted

The police never found the man in the red car with Connecticut plates. Evidence later suggested that it was serial rapist, Howard Gombert, who frequently drove his girlfriend's red car

that had Connecticut license plates. (*Id.* ¶ 34.) Wright's rape and murder fit Gombert's pattern. Previously, Gombert had lured and raped at least four other young girls using the same brutal methods: binding their hands behind their backs and gagging them with underwear or other clothing. (*Id.* ¶ 35.) He also caused the disappearance of another young girl, and, although he was never prosecuted for it, police later found her underwear in a suitcase in his apartment. (*Id.*) Shortly after Wright's murder, Gombert was convicted of another rape—he had isolated another young girl in the woods, held her hands behind her back, shoved underwear in her mouth, and raped her. (*Id.*) He is currently incarcerated, but he was never prosecuted for Wright's rape and murder. (*Id.* ¶¶ 34, 38.)

### C. Sheriff Thoubboron Orders a Quick Investigation

The discovery of Wright's body dominated Putnam news. (*Id.* ¶ 39.) Consequently, then-Sheriff Thoubboron, who was supposedly concerned about his re-election prospects, placed Defendant Stephens in charge of the investigation, knowing that he would do whatever it took to close the case quickly. (*Id.* ¶ 40-41.) Thoubboron also knew that, in the past, Stephens had used sham polygraph examinations and physical, psychological, and emotional pressure to coerce confessions regardless of their truth. (*Id.*) Indeed, Stephens had a reputation in Putnam for being able to coax a confession out of anybody. (*Id.*) He had conducted hundreds of interrogations and knew the physical, psychological, and emotional pressure points that would cause suspects to confess, regardless of their guilt. (*Id.*) Stephens turned to investigators Castaldo and Quick to do the groundwork on the case. (*Id.* ¶ 42.) Castaldo and Quick were more than willing to adopt Stephens's approach to investigations. (*Id.*)

**D. Stephens, Castaldo, and Quick Elicit or Attempt to Elicit False Statements from at least Six Witnesses**

Three days after Wright's remains were discovered, police arrested 18-year-old DiPippo, and his two teenaged friends, Andy Krivak ("Krivak") and Dominick Neglia ("Neglia"), after finding drugs in their car. (*Id*.¶ 44.) At the time, police knew DiPippo as a local teenaged troublemaker. (*Id*.¶ 43.) Upon the police's questioning, Neglia, who was scared and wanted to go home, gave a general statement indicating that DiPippo and Krivak knew something about Wright's murder. (*Id*.¶ 46.) In exchange for a false tip, Neglia was released from jail that evening despite the pending charges. DiPippo and Krivak were not. (*Id*.¶ 47.) Including Neglia, the police implicated the following witnesses in the investigation against DiPippo.

**1. Dominick Neglia**

Sixteen-year-old Neglia initially gave police a vague statement indicating that DiPippo and Krivak knew something about the murder. (*Id*. ¶¶ 44, 46.) That tip got Neglia out of jail, but it was not enough to prosecute DiPippo or Krivak. (*Id*. ¶ 47.) Consequently, Stephens ordered Castaldo and Quick to squeeze more out of Neglia. (*Id*. ¶ 48.) For weeks, Castaldo and Quick pressured, threatened, and cajoled Neglia to develop evidence against DiPippo—visiting him night and day at high school, his home, and his work. (*Id*. ¶ 49.) Castaldo and Quick pulled Neglia out of classes for interrogation so often that Neglia's high school principal asked them to stop. (*Id*.) They showed up so often at Neglia's job that Neglia was fired. (*Id*.) Eventually, Neglia succumbed and told Castaldo and Quick what they wanted to hear: that DiPippo had confessed to raping and murdering Wright. (*Id*. ¶ 50.) According to Neglia's false statement, DiPippo, Krivak, and some friends picked Wright up on their way home from a party in DiPippo's Bronco and then raped and murdered her. (*Id*.)

Neglia soon had misgivings and returned to the police station and represented that he no longer wanted to be involved in the investigation, but Castaldo struck Neglia in the back of the head with a pair of handcuffs and told him that he "didn't have any other choice" but to back up his statement. (*Id*. ¶¶ 51, 52.) Defendant Quick joined in, telling Neglia that he and Defendant Castaldo had both just witnessed Neglia fall out of his chair and hit his head. (*Id*.) Terrified of further violence, Neglia agreed to help elicit a false confession from DiPippo. (*Id*.) As part of this plan, Quick gave Neglia money and instructions to buy DiPippo drugs, get him high, and get him talking. (*Id*. ¶ 54.)

Neglia plied DiPippo with drugs, but DiPippo never gave the confession Defendants wanted. (*Id*. ¶¶ 54, 55.) Approximately two weeks later, Neglia falsely asserted that DiPippo, Krivak, their friends Adam Wilson ("Wilson"), Bill MacGregor ("MacGregor"), and a woman named "Patty" were driving Wright home from a party when DiPippo or Krivak had raped and murdered Wright. (*Id*. ¶ 56.) Neglia eventually soured on the plan. In a 1997 sworn recantation, he told Castaldo, Quick, and other PCSD officers that his statements implicating DiPippo had been coerced and false. (*Id*. ¶¶ 57, 59.) Neglia stated that he believed the story would "blow over" and never thought that DiPippo and Krivak would be prosecuted for Wright's rape and murder. (*Id*.)

Neglia did not testify against DiPippo or Krivak in the 1997 trial, the 2012 trial, or the 2016 trial. (*Id*. ¶ 58.) Indeed, he testified for the defense at DiPippo's 2012 pretrial hearing, but pleaded the Fifth Amendment on many issues raised at the trial because Defendants had allegedly threatened to prosecute him for perjury. (*Id*.) At DiPippo's 2016 retrial, however, Neglia testified that his statements were false, and he described the Defendants' misconduct. (*Id*.) Although Neglia told Castaldo, Quick, and other officers in the PCSD that his initial police statements were false— and that Anthony DiPippo had never confessed to him—Defendants misrepresented Neglia's

statements in writing and failed to document or disclose his recantations. (*Id.* ¶ 59.)[2]

## 2. Denise Rose

Using the same or similar methods, Stephens, Castaldo, and Quick coerced DiPippo's close friend Denise Rose ("Rose")—a 19-year-old with substance abuse problems—into falsely claiming to have witnessed DiPippo and Krivak rape and murder Wright. (*Id.* ¶ 65.) Castaldo and Quick threatened to prosecute Rose for Wright's murder and send her to jail for 25 years to life, unless she implicated DiPippo and Krivak in the crimes. (*Id.* ¶¶ 65, 67.) Under Stephens' direction, after other Defendants fed her non-public details about the crime,[3] including Neglia's false statement, and showed her Krivak's van that Castaldo and Quick had decided was the vehicle used in the crime after learning that DiPippo did not own a Bronco in 1994, she falsely stated that she had been in Krivak's van with DiPippo, Krivak, Wilson, MacGregor, and Wright, but that she had *not* witnessed Wright's murder. (*Id.* ¶¶ 68– 72.)

This statement was still not enough for Castaldo and Quick, who knew that they needed an eyewitness to the actual rape and murder to close their case. (*Id.* ¶ 73.) Days later, when Rose

---

[2] Among other unreliable details in Neglia's fabricated story, he had told police that Wright was abducted in DiPippo's Bronco. But DiPippo did not own a Bronco in 1994, and did not even have a driver's license. So, Defendants determined that if the crime occurred in a car, it would have to be a different car. Defendants settled on the brown van driven by DiPippo's purported accomplice Krivak, which was already in PCSD custody, impounded following Krivak's drug arrest. Police conducted a thorough inventory search at the time the van was impounded and collected numerous items, including paper, food, garbage, and two women's rings between the front seats. Approximately two months after Wright's remains were found, Detective John Daniel Rees conducted a "second inventory search" of Krivak's van at Castaldo's direction. Following this search, Detective Rees reported finding a lizard earring and cat's eye ring that had somehow been missed during the first inventory search. Wright's mother said that the lizard earring and the cat's eye ring had belonged to Wright. These two pieces of jewelry became key evidence supposedly linking DiPippo to Wright's murder. Defendant Castaldo vouchered the jewelry, which was later introduced as an exhibit at trial. Either Defendants planted Wright's jewelry in Krivak's van, or the jewelry never belonged to Wright at all, but Stephens, Castaldo, and Quick manipulated witnesses into reporting that it had. (Compl. ¶ 60-64.)

[3] For example, Defendants allegedly showed Rose photographs of Wright's recovered clothes from the crime scene, including her jeans, brown jacket, blood-stained sneakers, white t-shirt, and blue hologram pendant, as well as a lizard earring and cat's eye ring that belonged to Wright. (*Id.* ¶ 69.) They then deliberately included those details in her statement so that it would appear reliable. (*Id.*) They also told Rose that Wright's bra was found tied around her face, her underwear was pushed into her throat, and her hands were tied in front of her body, consistent with the police's mistaken belief at the time about how her hands had been tied. (*Id.* ¶ 70.)

had not yet so testified, she was arrested and charged with felony criminal mischief and a DWI—charges carrying seven and a half years in prison. (*Id*. ¶¶ 74–75.) To avoid that fate, she changed her story and told police that she had witnessed Krivak and DiPippo rape Wright in Krivak's van, bind her hands in front of her body with rope, stuff a bra in her mouth, and leave her body in the woods near Fields Lane. (*Id*. ¶ 80.)

The details of her story originated with Castaldo and Quick, and turned out to be false—as forensic testing later showed that Wright had been hogtied with her hands behind her back, not in front, as Rose had claimed. (*Id*. ¶¶ 81–84.) Castaldo and Quick never documented or disclosed that they threatened and coerced Rose to the point where her parents because extremely worried about her mental and physical health, gave her promises of leniency, or fed her details about the crime to create the fabricated statement. (*Id*. ¶¶ 85-87.) Consequently, Rose testified against DiPippo at all three of his trials. (*Id*. ¶ 92.) Her testimony was the only eyewitness account of his purported crimes, and her coerced statements helped lead to his conviction twice. (*Id*.)

### 3. Manipulating Witness Testimony of Adam Wilson, Bill MacGregor, Andrew Krivak, Michael Moynihan, and Others

Stephens, Castaldo, and Quick employed similarly gruesome and unethical tactics upon DiPippo's friends, Wilson[4] and Moynihan,[5] and MacGregor,[6] a teenaged drug user whom Neglia

---

[4] For example, Castaldo, Quick, and Stephens interrogated Wilson for 12-15 hours straight, denied him access to counsel, showed him the crime site, fed him false facts and a fabricated rendition of the event, threatened to get him in future legal trouble unless he corroborated their story and signed a pre-written statement, showed up at his home unannounced after he retained counsel, administered a sham polygraph examination, and enlisted one of his friends to secretly videotape him and induce him to recant his claims that the officers were coercing him. (*Id*. ¶¶ 95- 110.)

[5] The officers also found Moynihan, whom they isolated and brought to the police cell site for questioning. They also urged him to sign a pre-written statement and threatened him with future legal consequences if he did not. Moynihan did not sign the statement and was convicted with a DWI charge. (*Id*. ¶¶ 125-31.)

[6] The officers tricked MacGregor into meeting in person at a coffee shop and the brought him to a police cell site. They then interrogated him for hours without allowing him to leave. They made him sign a pre-written statement. They threatened him that if he did not a sign the statement, they would charge him with drug crimes and the rape and murder of Wright. They also put him in a room with Rose who also fed him the manipulated story. (*Id*. ¶¶ 111-22.)

and Rose had named as a bystander. (*Id*. ¶¶ 95-130.) Each of these witnesses were fed false and non-public facts about the investigation and/or was threatened to be the subject of additional prosecutions if they did not cooperate with the officers. (*Id*.)

Additionally, Stephens, Castaldo, and Quick coerced Krivak into giving a false confession. They arrested seventeen-year-old Krivak on July 1, 1996. (*Id*. ¶ 132.) That night, Stephens administered a sham polygraph examination. (*Id*. ¶ 133.) Stephens again used a mix of psychological and emotional coercion, physical intimidation, physical coercion, and suggestions to elicit a false confession from Krivak. (*Id*.) After concluding the examination, Stephens told Krivak that he "didn't do well." (*Id*.) After hours of interrogation and physical coercion, Krivak falsely confessed that he and DiPippo raped Wright and that DiPippo killed her. (*Id*. ¶ 134.) As with the other witnesses, Defendants fed Krivak non-public details from the crime scene and tried to make sure his testimony aligned with the other coerced statements. (*Id*. ¶ 135.) Ultimately, after hours of coercive interrogation including physical assault, Krivak signed a false statement consistent with Denise Rose's fabricated statement, in which he admitted to participating in Josette Wright's rape and murder. (*Id*. ¶ 136.) That statement contained several of the same non-public details Defendants had provided to Rose, including that Wright's hands were tied with rope and her underpants were stuffed in her mouth. (*Id*.) Later, Krivak stated that the confession was coerced and that he and DiPippo were innocent. (*Id*. ¶ 137.) He refused to testify against DiPippo even when offered a reduced sentence. On June 11, 1997, Krivak was convicted for raping and murdering Wright, and he remains in prison. (*Id*. ¶ 138.)

Stephens and other PCSD supervisors were involved in every step of the investigation, and Stephens was present for many of the coercive interviews with purported witnesses. (*Id*. ¶ 139.) Stephens and other supervisors purportedly knew about Castaldo and Quick's misconduct,

personally participated in it, and failed to document or disclose it. (*Id*.) Stephens and other supervisors also allegedly failed to prevent Castaldo and Quick from engaging in misconduct, participated in it, encouraged it, and affirmatively misrepresented to prosecutors that no misconduct had occurred. (*Id*.) Stephens, Castaldo, and Quick knew that the statements they obtained from Rose, Wilson, MacGregor, and Krivak were entirely false. (*Id*. ¶ 140.) They also knew that those statements were contradicted by evidence of Howard Gombert's guilt. (*Id*.)

Defendants disclosed Rose's, Wilson's, MacGregor's, and Krivak's fabricated statements to the prosecution, but affirmatively and repeatedly misrepresented that all the facts in their statements were volunteered by the witnesses without coercion or suggestions. (*Id*. ¶ 141.) In fact, Defendants knew that police provided all of the details of the inculpatory statements to the witnesses. (*Id*.) These false and fabricated statements formed the prosecution's case theory and played a large role in DiPippo's arrest, prosecution, conviction, and incarceration. (*Id*. ¶ 143.) Stephens updated Thoubboron about all major investigatory developments. (*Id*. ¶ 144.) Hence, Thoubboron was either aware of the misconduct committed by Defendants Stephens, Castaldo, and Quick or willfully blind to it. (*Id*.) Defendants hid their misconduct from the prosecution, defense counsel, the court, and the jury. (*Id*. ¶ 145.) Despite their claimed involvement in the crimes, the police never charged Rose, MacGregor, or Wilson with any crime related to Wright's rape and murder. (*Id*. ¶ 146.)

### E. Defendant Nestor Fabricates a Jailhouse Confession

Castaldo and Quick also worked with Nestor, a corrections officer with the PCSD, to fabricate a false inculpatory statement attributed to DiPippo. (*Id*. ¶ 173.) Nestor falsely claimed, in a written report prepared in Quick's presence, that DiPippo had admitted he was present at the time of Wright's murder but that he had been high and could not remember anything. (*Id*.) Nestor's

false statement mirrored a statement Castaldo and Quick had obtained from Scott Chestnut, a heroin addict and jailhouse snitch, who had been promised a more favorable housing placement in exchange for inculpatory evidence against DiPippo. (*Id*. ¶ 172.) Nestor testified to this fabricated admission at all three of DiPippo's trials, including the 2016 trial, after which DiPippo was acquitted. (*Id*. ¶ 173.)

### F. DiPippo is Tried and Convicted in 1997 and 2012

In 1997, after hearing the fabricated evidence from Rose, MacGregor, Nestor, and others, a jury convicted DiPippo of raping and murdering Wright. (*Id*. ¶¶ 173–75.) Between 1997 and 2011, DiPippo continually protested his innocence, filing numerous challenges to his conviction. (*Id*. ¶ 177.) While incarcerated, he learned that his first defense attorney had previously represented Howard Gombert against unrelated rape allegations and thus had a conflict of interest. (*Id*. ¶ 178.) In 2011, on that basis, the Supreme Court, Appellate Division, vacated DiPippo's conviction and ordered a new trial. (*Id*. ¶ 179.) During the second jury trial, however, the trial court refused to admit evidence of Gombert's guilt, and DiPippo was again convicted for Wright's rape and murder—based on the fabricated testimony of Rose, Nestor, and others. (*Id*. ¶¶ 173, 180.)

### G. New DNA Evidence Emerges and DiPippo is Acquitted

After DiPippo returned to prison, new evidence of his innocence emerged. (*Id*. ¶ 182.) DNA testing of Krivak's van failed to detect any trace of Wright's DNA in DiPippo's van—even though she had supposedly been brutally raped and murdered there by two men twice her size. (*Id*.) After video footage came to light of Castaldo beating and possibly kicking a subdued, shackled prisoner, PCDA Attorney Adam Levy began reinvestigating DiPippo's conviction. (*Id*. ¶¶ 183-84.) DA Levy and the New York State Office of the Attorney General discovered evidence that Castaldo had tampered with witness testimony and withheld evidence from DiPippo's

defense—including notes from an investigation of one of Gombert's other victims. (*Id.* ¶¶ 184–91.) DA Levy and an Assistant Attorney General also interviewed Rose and concluded that Castaldo had shown her much of the evidence in the Wright homicide and had met with her repeatedly to shape her false statement. (*Id.*) Rose admitted that Castaldo and Quick had threatened her with prosecution if she refused to testify against DiPippo. (*Id.*)

In March 2016, the Court of Appeals reversed DiPippo's 2012 conviction, ruling that evidence of Gombert's involvement should have been admitted into evidence at trial. (*Id.* ¶ 194.) DA Levy had lost reelection, however, and Putnam County's new district attorney decided to prosecute DiPippo based on Defendants' continuing misrepresentations and the same false evidence presented at the 2012 trial. (*Id.* ¶¶ 192, 195.) This time, however, DiPippo's defense could introduce evidence about Howard Gombert's culpability and Rose's admissions to DA Levy; hence, after a nearly monthlong trial, the third jury acquitted DiPippo. (*Id.* ¶¶ 196, 197.) Consequently, he had spent more than 20 years wrongfully incarcerated. (*Id.*)

He now sues for the damages caused by Defendants' unconstitutional misconduct, alleging, among other things: that Putnam had an unconstitutional pattern or practice of coercing false witness statements through sham polygraph examinations, threats of prosecution, and physical and psychological intimidation; that Thoubboron has supervisory liability because of his oversight of his subordinates; and that Nestor's false statements to Castaldo and Quick caused DiPippo's conviction. (*Id.* ¶¶ 198-259.)

## LEGAL STANDARD

Under Rule 12(b)(6), the inquiry for motions to dismiss is whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550

U.S. 544, 570 (2007)). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 679. The Court must take all material factual allegations as true and draw reasonable inferences in the non-moving party's favor, but the Court is "'not bound to accept as true a legal conclusion couched as a factual allegation,'" or to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). In determining whether a complaint states a plausible claim for relief, a district court must consider the context and "draw on its judicial experience and common sense." *Id*. at 679. A claim is facially plausible when the factual content pleaded allows a court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.

For motions brought under Rule 12(b)(1), "[a] case is properly dismissed for lack of subject matter jurisdiction . . . when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). "In resolving a motion to dismiss under Rule 12(b)(1), the district court must take all uncontroverted facts in the complaint (or petition) as true and draw all reasonable inferences in favor of the party asserting jurisdiction." *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014). "[T]he court may resolve the disputed jurisdictional fact issues by referring to evidence outside of the pleadings, such as affidavits, and if necessary, hold an evidentiary hearing." *Zappia Middle E. Constr. Co. v. Emirate of Abu Dhabi*, 215 F.3d 247, 253 (2d Cir. 2000). Though a court "may consider affidavits and other materials beyond the pleadings to resolve the jurisdictional issue, [it] may not rely on conclusory or hearsay statements contained in the affidavits." *J.S. ex rel. N.S. v. Attica Cent. Sch.*, 386 F.3d 107, 110 (2d Cir. 2004).

**DISCUSSION**

Defendants Putnam, Thoubboron, and Nestor move to dismiss Plaintiff's *Monell* liability, supervisory liability, and failure to intervene claims on the basis that they fail to state a claim upon which relief may be granted. (*See* Defendants Memorandum in Support of its Motion to Dismiss, ("Def. Mem."), ECF No. 30.) Further, all Defendants move to dismiss Plaintiff's due process claims and state tort claims as a matter of law. The Court addresses each claim in turn.

## I. *Monell* Claim Against Putnam

Plaintiff claims that he has properly pleaded a *Monell* claim against Putnam under three different legal theories. The first is based on the PCSD's unofficial practice of threatening witnesses with prosecution and/or subjecting them to sham polygraph examinations to obtain false evidence. (Plaintiff's Opposition to Motion to Dismiss, ("Pl. Opp."), at 11, ECF No. 31.) The second is based on Putnam's failure to train/ supervise PCSD officers despite allegedly widespread and well-known investigatory misconduct. (*Id*. at 15.) The third is based on Sheriff Thouborron's specific decision to assign Stephens to oversee the Wright investigation, despite allegedly knowing that Stephens would likely use unconstitutional methods to procure a conviction. (*Id*. at 18.)

Defendants claim that each of Plaintiff's *Monell* theories is insufficiently pleaded and does not state a claim under Rule 12(b)(6). (Def. Mem. at 9.) First, they claim that because Plaintiff only points to the *Deskovic* case as an example of similar unlawful conduct by the PCSD, Plaintiff's claim constitutes "mere allegations of a municipal custom, a practice of tolerating official misconduct, or inadequate training and/or supervision." (*Id*.) They further claim that Plaintiff's claims under failure-to-train and failure-to-supervise theories fail because there are no factual allegations suggesting that the PCSD received prior complaints of similar civil rights violations and failed to investigate or forestall them. (*Id*. at 10.) They similarly claim that there are

insufficient facts alleged to show that Thouborron was ever put on notice or was personally involved in the deprivation of Plaintiff's constitutional rights. (*Id*. at 9.)

### A. *Monell* Liability Based on Custom or Policy

Under *Monell*, a municipality may be held liable for constitutional violations when "the municipality itself caused or is implicated in the constitutional violation." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113 (2d Cir. 2004). A *Monell* claim requires a plaintiff to allege: (1) a custom or policy, (2) that subjected a Plaintiff, (3) to a denial of a constitutional right. *See Ferrari v. Cty. of Suffolk*, 790 F. Supp. 2d 34, 40 (E.D.N.Y. 2011). Further, a municipality may be liable if its "policy or custom, whether made by its lawmakers *or by those whose edicts or acts may fairly be said to represent official policy*, inflicts the injury." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694, 98 S. Ct. 2018, 2037 (1978) (emphasis added). Hence, both official and unofficial policies may suffice for establishing *Monell* liability. For an unofficial policy or custom to invite *Monell* liability, the practice, custom or usage must be so widespread and so persistent that it has the force of law. *See Lauro v. City of New York*, 39 F. Supp. 2d 351, 366 (S.D.N.Y. 1999), *rev'd and rem'd on other grounds*, 219 F.3d 202 (2d Cir. 2000).

Neither party disagrees that a plaintiff can rely on allegations of similar misconduct to plead that there was a widespread practice, policy or custom. What the parties dispute is how many instances of similar conduct Plaintiff needs to describe to meet the *Iqbal/Twombly* pleading requirements. Plaintiff's core argument is that the Complaint is sufficient based on the described pattern of similar investigatory misconduct that Defendants Quick, Castaldo, and Stephens employed on many witnesses, including: Neglia, Rose, Wilson, Mac Gregor, Krivak, and Moynihan. (Def. Mem. at 13.) These practices included: conducting coercive investigations, administering sham polygraph examinations, inducing witnesses to withdraw exculpatory

statements, and encouraging witnesses to submit false and misleading statements, amongst others. (*See id*. at 13-14.) Plaintiff also believes that he has pleaded a pattern by relating the present case to the case of *Deskovic v. City of Peekskill*, 894 F. Supp. 2d 443, 448-50 (S.D.N.Y. 2012), another exoneration case involving Putnam, where the jury ultimately found that Stephens violated the defendant's constitutional rights by eliciting from the defendant a false confession, which then led to the defendant's wrongful conviction for rape and murder.

Defendants argue that the instances that Plaintiff has described within the Wright investigation and with regards to the *Deskovic* case are insufficient to support a *Monell* claim. They additionally argue that the *Deskovic* decision is inapplicable since they jury found Stephens conduct unconstitutional many years after the Wright investigation closed, and thus, it does not show that Putnam had notice of civil rights violations during the Wright investigation itself.

This Court disagrees with Defendants and finds Plaintiff's *Monell* claim adequately pleaded. The Court first addresses Defendants' contention that Plaintiff has not pleaded enough examples of unlawful conduct to pass the plausibility threshold. The Court sees no reason to discount the many examples that Plaintiff has described within the Wright investigation. Plaintiff has pleaded ample specific facts indicating that Defendants used extremely similar coercive investigative techniques on at least six witnesses within the Wright investigation. These techniques included: procuring testimony that implicated DiPippo in exchange for leniency, threatening witnesses with prosecutions against them if they did not provide inculpatory testimony, harassing and assaulting witnesses over extended periods of time, isolating witnesses and interrogating them for hours, forcing or attempting to force witnesses to sign false affidavits or other pre-written statements, administering sham polygraph examinations, failing to keep records of meetings with witnesses, using force on witnesses, and denying witnesses the opportunity to consult with counsel.

(*See* Compl. ¶¶ 45-59, 65-92, 95-138.) Defendants have not provided any authority, which holds that multiple examples of coercive conduct from within the same large investigation cannot support a *Monell* claim.

Further, as Plaintiff notes, in *Ferrari v. Cty. of Suffolk*, 790 F. Supp. 2d at 45, the district court allowed a plaintiff's *Monell* claim against Suffolk County to survive, where before engaging in discovery, Plaintiff identified only two instances, in addition to his own, of similar allegedly unconstitutional conduct taken by Suffolk County hearing officers. *Id*. The Court explained that while only three instances (including Plaintiff's own claim) might not suffice to overcome summary judgment, at the pleading stage, "they do permit a plausible inference of a widespread practice of informal custom within Suffolk County." *Id*. Put simply, the pre-discovery pleading standard for a custom or practice is not a high bar.

Similarly, in *Michael v. Cty. of Nassau*, No. 09-CV-5200, 2010 WL 3237143 (E.D.N.Y. Aug. 11, 2010), the Court explained that at the pleading stage, *Monell* does not even require a Plaintiff to identify a specific policymaker who promulgated a policy or custom or an express rule or regulation. *Id*. at *4. Rather, the Court explained that it is enough for a plaintiff to plead that a city had a general unconstitutional policy, such as tolerating police misconduct and failing to properly train officers, and that such unconstitutional conduct occurred frequently enough to produce an informal, policy, custom, or practice of which the County was aware. *Id*. Indeed, the Court explicitly stated that the *Iqbal/Twombly* standard is "context-specific," and that a plaintiff has "no realistic way to learn about a municipality's training programs without discovery."

Other courts around the country have also discussed why a *Monell* claim, based on a widespread custom or policy, must be context-specific and cannot be reduced to an overly simplistic analysis of the number of instances alleged. Rather, it must be based on the number of

instances alleged *relative to the size* of the county's sheriff department and relative to the time frame at issue. The court's main concern, after all, is to vet credible claims and ensure that a plaintiff has pleaded enough facts to show that a county was *aware* of pattern or custom and acquiesced to unconstitutional conduct.

Hence, in *Brown v. City of Margate*, 842 F.Supp. 515, 518 (S.D. Fla. 1993), the Defendants raised a similar argument that the plaintiff's allegations of only two similar incidents of police brutality were insufficient to support *Monell* liability. The district court, however, specifically explained that its job is not to rely on the *number* of reported incidents to determine whether a policy is "persistent and widespread," but to assess whether under the totality of circumstances, based on the size of the municipality, the size of sheriff's department, and the relevant time frame, it could be inferred that the municipality had notice of the unlawful conduct. *Id*. The Court even noted that a large number of alleged instances could be insufficient to show a custom, pattern or policy in a large metropolitan area, such as Washington D.C., but be more than sufficient in a small town with only five or six police officers. *Id*.

Lastly, Plaintiff has pointed out numerous examples from within the Second Circuit in which the district court allowed a *Monell* claim to survive where the Plaintiff alleged only a few examples of similar misconduct. *See Reyes v. Cty. of Suffolk*, 995 F. Supp. 2d 215 (E.D.N.Y. 2014); *Castilla v. City of New York*, No. 09 CIV. 5446, 2012 WL 3871517 (S.D.N.Y. Sept. 6, 2012); *Tyus v. Newton*, No. 3:13-CV-1486, 2015 WL 1471643 (D. Conn. Mar. 31, 2015). While Defendant goes through much effort to distinguish minute factual differences between those cases and the instant case, the Court finds that Defendants distinctions ultimately ring hollow. For example, Defendant distinguishes *Ferrari* on the basis that, there, the plaintiff provided two examples apart from his own case, whereas here, Defendant pointed out one. As discussed, this distinction is

frivolous and misses the point. With regards to *Reyes*, the Defendant discounts it because one of the cases the plaintiff relied on was *Ferrari*. Regarding *Castilla* and *Tyus*, the Defendant argues that there is a somehow a material distinction because, in those cases, the plaintiff listed multiple *specific* examples of sexual misconduct the defendants engaged in as compared to here.

Defendants' specificity arguments are the most incredulous of them all. DiPippo has alleged numerous specific examples of misconduct that specific PCSD officers engaged in with specific witnesses. Just as some examples, Plaintiff describes:

- When Castaldo and Quick first met with Neglia at the police station and represented that he no longer wanted to be involved in the investigation, but Castaldo struck him in the back of the head with a pair of handcuffs and told him that he "didn't have any other choice" but to back up his statement. (Compl. ¶¶ 51, 52.)

- Defendant Quick joined in with Castaldo, telling Neglia that he and Defendant Castaldo had both just witnessed Neglia fall out of his chair and hit his head. (*Id*.)

- Castaldo and Quick devised a plan to garner inculpatory evidence from DiPippo and thus gave Neglia money and instructions to buy DiPippo drugs, get him high, and get him talking. (*Id*. ¶ 54.)

- Castaldo and Quick also came up with an elaborately detailed story about how the murder rape and murder occurred in DiPippo's impounded car in which they planted evidence. (*Id*. ¶ 60-64.)

- Neglia eventually soured on the plan and submitted the sworn recantation, but Defendants misrepresented Neglia's statements in writing and failed to document or disclose his recantations. (*Id*. ¶ 59.)

- Under Stephens' direction, Quick and Castaldo fed Rose non-public details about the crime, including Neglia's false statement, and showed her Krivak's van that Castaldo and Quick had decided was the vehicle used in the crime. (*Id*. ¶¶ 68– 72.)

- Castaldo and Quick frequently threatened her and induced her to testify against DiPippo at all three of his trials as an eye-witness to the murder. (*Id*. ¶ 92.)

- Stephens, Castaldo, and Quick coerced Krivak into giving a false confession by administering a false polygraph examination and making him sign a false confession statement. (*Id*. ¶¶ 133-38.)

- Stephens affirmatively misrepresented to prosecutors that no misconduct was

occurring and all the facts in the witnesses statements were volunteered by the witnesses without coercion or suggestions. (*Id.* ¶¶ 139-141.)

- Castaldo, Quick, and Stephens interrogated Wilson for 12-15 hours straight, denied him access to counsel, showed him the crime site, fed him false facts and a fabricated rendition of the event, threatened to get him in future legal trouble unless he corroborated their story and signed a pre-written statement, showed up at his home unannounced after he retained counsel, administered a sham polygraph examination, and enlisted one of his friends to secretly videotape him and induce him to recant his claims that the officers were coercing him. (*Id.* ¶¶ 95- 110.)

- Castaldo, Quick, and Stephens also tricked MacGregor into meeting in person at a coffee shop and the brought him to a police cell site. They then interrogated him for hours without allowing him to leave. They made him sign a pre-written statement. They threatened him that if he did not a sign the statement, they would charge him with drug crimes and the rape and murder of Wright. They also put him in a room with Rose who also fed him the manipulated story. (*Id.* ¶¶ 111-22.)

- Castaldo, Quick, and Stephens also found Moynihan, whom they isolated and brought him to the police site for questioning. They then urged him to sign a pre-written statement and threatened him with future legal consequences if he did not. Moynihan did not sign the statement and was convicted with a DWI charge. (*Id.* ¶¶ 125-31.)

Again, the distinction with *Ferrari*, where the Defendant pointed out *two* cases apart from Plaintiff's own compared to just one is an arbitrary difference that fails to address the heart of the issue here – whether Putnam likely had notice of a persistent unconstitutional practice. Moreover, the *Descovic* could very likely reveal multiple examples of coercive practices since it regards another lengthy investigation related to a murder that was conducted by many of the same officers in the same time frame. Lastly, the notion that *Reyes* should be discounted because it relies on *Ferrari* lacks merit. That *Reyes* upholds *Ferrari* only further bolsters plaintiff position.

Ultimately, *Monell* liability and *Iqbal/Twombly* plausibility is a context-specific task that requires a court to look at pre-discovery allegations and assess whether there are enough facts to justify opening the doors to further discovery. This is not a close case. Plaintiff has clearly pleaded sufficient facts to show an unlawful pattern or practice within the Wright investigation and more

broadly in Putnam, where there was a small Sheriff's office and only a few high-profile murder cases that led to long incarcerations in a limited time period. The Court further notes that DiPippo was wrongfully convicted twice and tried three times by a jury, and Plaintiff has alleged facts that indicate that the PCSD officers used similar unconstitutional methods in every trial. (*See e.g., Compl.* ¶¶ 65–93) (describing how Stephens, Castaldo, and Quick coerced Rose into falsely claiming to have witnessed DiPippo and Krivak murder and rape Wright by threatening to prosecute her and feeding her non-public details about the crime, which led her to falsely testify against DiPippo in all three of his trials); (*Id.* ¶¶ 172-73) (describing how Castaldo and Quick worked with Corrections Officer Nestor to fabricate a false inculpatory statement that they provided to the prosecution and used in all three of DiPippo's trials.) And lastly, Plaintiff has provided enough facts to allow a factfinder to infer that Putnam had notice of these acts, as multiple witnesses tried to recant their statements and testify on DiPippo's behalf. (*See e.g.*, Compl. ¶ 59) (describing how in a 1997 sworn recantation, Neglia told Castaldo, Quick, and other PCSD officers that his statements implicating DiPippo had been false, and how these Defendants nevertheless misrepresented his statements and failed to document or disclose the recantations.) The very fact that the case was retried twice permits the inference that the County had notice of the dubious conduct and evidentiary practices at issue. Accordingly, at this time, Plaintiff's *Monell* claim survives, and Defendants' motion to dismiss it is DENIED.

Since the Court need only sustain Plaintiff's *Monell* claim on a single theory of liability, it need not address the merits of the *Monell* claim under alternative theories of liability, such as failure to train/supervise or the conduct of an official. But because there is considerable overlap between what Plaintiff needs to show to make out those claims and a claim for supervisory liability

against Thouborron, the Court will briefly discuss, in the following discussion on supervisory liability, why those theories would also likely be valid avenues for *Monell* liability.

## II.     Supervisory Liability Claim Against Sheriff Thoubboron

Defendants claim that Plaintiff's Complaint fails to state a claim against Sheriff Thoubboron "because it is absent of any facts from which one could plausibly infer Sheriff Thoubboron's personal involvement in the deprivations of Plaintiff's constitutional rights." (Def. Mem. at 4.) Defendants add that Sheriff Thoubboron cannot be held liable merely because he held a position of high authority, but only if he was personally involved in the alleged deprivation. (*Id*.) Defendants claim that Plaintiff has failed to adequately show that Sheriff Thoubboron: (1) participated directly in the alleged constitutional violation, (2) after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) created a policy or custom under which constitutional practices occurred, or allowed the continuance of such a policy or custom, (4) was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) exhibited deliberate indifference by failing to act on information indicating that unconstitutional acts were occurring. (*Id*. at 4-5) (citing *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1985)). In short, Defendants claim that Plaintiff's complaint fails to give rise to a plausible inference of Sheriff Thouborron's personal involvement.

Plaintiff does not disagree about the general applicability of the *Colon* factors, any of which can be used to demonstrate a supervisor's personal involvement. Rather, Plaintiff claims that it is enough that he has pleaded that investigating Wright's murder was on Sheriff Thoubboron's radar, and that Thoubboron was worried about the crime's publicity, and thus, intentionally selected Stephens to lead the investigation, knowing his reputation for using coercive and unlawful tactics to obtain evidence. (Pl. Opp. at 20.) Hence, Plaintiff argues that although Thouborron may not

have been personally present during any of the interrogations, it is probable that Thoubboron was kept abreast of developments in the case, given its importance to his political prospects and the myriad complaints that were being made about Stephens' and his subordinates' interrogations.

The Court agrees with Plaintiff. Plaintiff's Complaint contains, *inter alia*, the following facts related to Sheriff Thouborron:

- Defendant Thoubboron is the former Sherriff who led PCSD and worked for Putnam and the State of New York for 16 years, from 1986 to 2001. (Compl. ¶ 27.)

- Thoubboron was the PCSD's final policymaker from 1986 to 2001, including during the Wright investigation and DiPippo's first trial in 1997. (*Id.*)

- Thoubboron was acquainted with the PCSD's policies, practices and customs. (*Id.*)

- After the publicity and hype surrounding Wright's murder, Thoubboron, wanted to reassure the public by solving the case before his next election. (*Id.* ¶ 40.)

- Thoubboron placed then-Supervisor of the Bureau of Crime Investigations, Defendant Stephens, in charge of staffing the investigation and solving the crime, knowing that Stephens would secure a quick conviction to quell anxiety and reassure the public, even if he had to use coercive, unlawful tactics to do so. (*Id.*)

- Stephens had a reputation in Putnam county for being able to coax a confession out of anybody. He had conducted hundreds of interrogations and knew the physical, psychological, and emotional pressure points that would cause suspects to confess-regardless of their guilt. (*Id.* ¶ 41.)

- Neglia eventually soured on [Stephens', Castaldo, and Quick's] plan. In a 1997 sworn recantation, he told Castaldo, Quick, *and other PCSD officers* that his statements implicating DiPippo had been coerced and false. (*Id.* ¶¶ 57, 59.)

- Neglia stated that he believed the story would "blow over" and never thought that DiPippo and Krivak would be prosecuted for Wright's rape and murder. (*Id.*)

- Neglia did not testify against DiPippo or Krivak in the 1997 trial. (*Id.*)

- Upon information and belief, Defendant Stephens updated Defendant Thoubboron about all major investigatory developments. Thouborron was either aware of the misconduct committed by Defendants Stephens, Castaldo, and Quick, or he was willfully blind to it. (*Id.* ¶ 144.)

Defendants are correct that these facts may not suffice to show that Sheriff Thouborron participated *directly* in the constitutional violation, but that is only the first *Colon* factor. The Court finds that the facts are sufficient to support the four remaining factors. The fact that Neglia spoke about the unconstitutional investigative techniques with "other PCSD officers" and submitted a sworn recantation in 1997, when Sheriff Thouborron was still Sheriff, makes it more than plausible that Thouborron either received a report reflecting the violations and failed to remedy the wrong or exhibited deliberate indifference by failing to act on information indicating that unconstitutional acts were occurring. Either of these supports a theory of supervisory liability. Further, the facts indicating that Thouborron both appointed Stephens and his subordinates to run the Wright investigation despite knowing about their reputations for engaging in unlawful coercive techniques and that he received updates on "all major investigatory developments" plausibly support that he created a policy or custom under which constitutional violations occurred, allowed the continuance of such a policy or custom, or was grossly negligent in supervising subordinates who committed wrongful acts. All three of these theories are also routes to supervisory liability.

In short, Plaintiff has gone beyond simply providing "formulaic recitation[s] of the elements of a cause of action" and has provided sufficient factual detail, at this pre-discovery juncture, to raise a right to relief above the speculative level and put Defendants on "fair notice of what the ... claim is and the grounds upon which it rests." *Twombly,* 550 U.S. at 55; *Iqbal,* 129 S.Ct. at 1949 ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."); *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (explaining that the *Twombly* Court stated that "[a]sking for plausible grounds to infer an agreement does not impose a

probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal[ity].").

Accordingly, Defendants' Motion to Dismiss the supervisory liability claim against Sheriff Thouborron is DENIED.

### A. *Monell* Liability Based on Conduct by One Official

A municipality may be held liable for the actions of lower-level employees, where a policymaking official ordered the actions taken or "exhibits deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction constitutes a 'deliberate choice.'" *Amnesty*, 361 F.3d at 126 (quoting *City of Canton v. Harris,* 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)). In the latter case, "that acquiescence may 'be properly thought of as a city 'policy or custom' that is actionable under § 1983.'" *Id.* When a plaintiff alleges that the relevant acts "were taken or caused by an official whose actions represent official policy, the court must determine whether that official had final policymaking authority in the particular area involved." *Jeffes v. Barnes*, 208 F.3d 49, 57 (2d Cir. 2000). Whether the official possessed final policymaking authority in a particular area of the local government's business is a question of state law. *Id.*

Here, the facts Plaintiff alleged, which are sufficient to support a theory of supervisory liability, are also sufficient to support a claim for *Monell* liability based on the conduct of Sheriff Thouborron. The requirements for *Monell* liability based on the conduct of a final policymaker are near identical to those for supervisory liability and Plaintiff has pleaded that, at relevant times, Sheriff Thouborron was the PCSD's final policymaker and that he made a deliberate decision to assign Stephens and his subordinates to run the Wright investigation. Accordingly, this alternative theory of *Monell* liability is plausibly pleaded.

### B. *Monell* Liability Based on Failure to Train/Supervise

Municipal liability may also be premised on a failure to train employees when inadequate training "reflects deliberate indifference to ... constitutional rights." *City of Canton v. Harris,* 489 U.S. 378, 392, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). To prove deliberate indifference, a plaintiff must properly plead: (1) "that a policymaker knows 'to a moral certainty' that her employees will confront a given situation"; (2) "that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation"; and (3) "that the wrong choice by the ... employee will frequently cause the deprivation of a citizen's constitutional rights." *Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 440 (2d Cir. 2009) (citing *Walker v. City of New York,* 974 F.2d 293, 297–98 (2d Cir.1992)).

Similar to *Monell* liability based on the conduct of one official with final policymaking authority, the requirements for *Monell* liability based on a failure to train or supervise overlap with those required to show supervisory liability. The Court has already assessed the Complaint and found that those overlapping elements have been adequately pleaded. Consequently, Plaintiff's second alternative theory of *Monell* liability is sufficiently pleaded.

### III. Failure to Intervene Claims against All Defendants

Defendants claim that Plaintiff's failure to intervene claim, raised against all Defendants, is insufficient to state a plausible claim under Rule 12(b)(6). (Def. Mem. at 11.) Specifically, Defendants argue that because "Plaintiff resorts to conclusory generalized allegations," and fails to identify which specific defendants violated which specific rights, they do not give any of the Defendants fair notice of what Plaintiff's claims are and the grounds upon which they rest. (*Id.*) They also argue that there is an inherent contradiction in Plaintiff pleading that each individually

named Defendant participated in the unlawful conduct that resulted in depriving Plaintiff of his constitutional rights and that they failed to intervene and prevent it. (*Id*. at 11-12).

Plaintiff argues that the failure to intervene claims are appropriately pleaded in the alternative against each defendant and that Rule 8 allows a plaintiff to state as many separate claims or defenses as it has, regardless of consistency. (Pl. Opp. at 23.) Plaintiff also argues that he has pleaded sufficient facts against each of the six defendants for a failure to intervene claim to survive against each one. (*Id*. at 23-24.)

Here, the Court agrees with Defendants that the claims are made as a general, conclusory, blanket claims against all Defendants, and are insufficient to put each Defendant on notice about what Plaintiff's actual grievances are. In *Ying Li v. City of New York*, 246 F. Supp. 3d 578, 629 (E.D.N.Y. 2017), another wrongful conviction case in which the plaintiff raised a similar palette of claims as those raised here, the plaintiff made a broad failure to intervene claim against all the defendants, without specifying which conduct pertained to which defendants. *See id*. at 618 ("The Amended Complaint asserts, as part of Plaintiff's Section 1983 claim, that all Defendants failed to intervene to prevent other Defendants from violating her constitutional rights not to be subjected to false arrest, malicious prosecution, and abuse of process.").

The district court dismissed all these claims for two reasons:

> First, Plaintiff's allegations are merely conclusory. Second, Plaintiff resorts to conclusory generalized allegations asserting her failure to intervene claim against every single Defendant and refers to the numerous defendants collectively. Such conclusory and generalized allegations do not give any of the Defendants "fair notice of what [Plaintiff's] claim is and the grounds upon which it rests."

*Id*. at 619. The Court cited many cases in which similar claims could not stand and added:

> restatement of the legal standard ... does not sufficiently allege constitutional violations in which the [defendants] might have intervened. Where were the [defendants] in relation to Plaintiff and in relation to each other? What

> impermissible actions did they take? Which officers observed those actions? Plaintiff does not say. Accordingly, he fails to nudge his failure to intervene claim from possible to plausible.

*Id*. Finally, the Court added that "a generalized pleading, which fails to differentiate between the Defendants, is especially problematic where, as here, Plaintiff is also alleging that Defendants are all liable under a theory of direct participation." *Id*.

This Court agrees with the reasoning of the Court in *Ying*. Plaintiff's argument that his failure to intervene claim is sufficiently pleaded against each individual Defendant because he alleged that Stephens, Castaldo, and Quick were "each present during multiple coercive interrogations" but that he does not know "which officer applied the coercion and which (if any) merely looked on" cannot overcome the lack of detail that is required as far as who took which impermissible action against whom at which time. *See Bouche v. City of Mount Vernon*, No. 11–Civ–5246, 2012 WL 987592, at *7 (S.D.N.Y. Mar. 23, 2012) (dismissing the plaintiff's failure to intervene claim because the plaintiff "only refer[red] to the defendants in the collective, never identifying which defendants were responsible for specific actions").

There are similar problems with the claims against Nestor and Thouborron. For example, Plaintiff claims that Nestor allegedly "took a direct role by fabricating evidence," but also could be liable for "failing to stop Quick from submitting his fabricated police report to the prosecution." (Pl. Opp. at 24.) Plaintiff raises this argument as a hypothetical possibility only in his brief. It is not pleaded as an event that occurred or could have occurred in Plaintiff's complaint. As far as the Complaint is concerned, all that it relays about Nestor's fabrication incident is that Nestor prepared his false statement "in Quick's presence" (Compl. ¶ 30.) It never even relays that there may have been a way that Nestor could have affected what Quick did or did not do with that statement.

Similarly, Plaintiff argues in his brief that, at this early stage, he has no access to discovery that could reveal "whether Thoubboron directly ordered the misconduct or just took no action while his subordinates violated DiPippo's rights." (Pl. Opp. at 24.) Plaintiff's lack of access to evidence, however, cannot cure his pleading deficiency. Under Rule 12(b)(6), the Court is "'not bound to accept as true a legal conclusion couched as a factual allegation,'" or to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

Accordingly, the Court finds that Plaintiff's failure to intervene claim against all Defendants is insufficiently pleaded at the present juncture and is therefore dismissed without prejudice. But should Plaintiff adduce facts during discovery that can color his claims with sufficient particularity, he may re-plead these claims in due time.

## IV.    Fabrication Claim Against Nestor

Plaintiff next alleges that Nestor fabricated an admission by Plaintiff, drafted an affidavit for Stephens containing false statements, and testified falsely at trial regarding Plaintiff's admission that he was present at the time of Wright's Murder. (*See* Compl. ¶ 173) ("Nestor falsely claimed in a later written report, prepared in Quick's presence, that DiPippo admitted that he was there at the time of Wright's murder but that he had been high and could not remember anything. Nestor testified to this false admission at all three of DiPippo's trials.") (*See also Id*. ¶ 231(b)). Plaintiff additionally alleges that Nestor, in concert with Stephens, Castaldo, and Quick, violated 42 U.S.C. § 1983 by depriving Plaintiff of his right to be free from unreasonable searches and seizures, maliciously prosecuting him, depriving Plaintiff of liberty without due process, and infringing his right to a fair trial. (*Id*. ¶¶ 229-32.)

Defendants argue that Plaintiff's allegations are insufficient to state a claim that Nestor violated Plaintiff's right to a fair trial or maliciously prosecuted him because "it is well settled that fair trial claims based on fabricated evidence or information are restricted to 'cases in which an (1) investigating official (2) fabricates information (3) that is likely to influence a jury's verdict, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of life, liberty, or property as a result.'" (Def. Mem. at 10-11) (citing *Garnett v. Undercover Officer C0039*, 838 F.3d 265 (2d Cir. 2016)). Further, Defendants argue, because Nestor did not play any role as an "investigating officer" in Wright's case and was merely employed as a corrections officer, the claim against him cannot stand. (Def. Mem. at 11) (citing *Dufort v. City of New York*, 874 F.3d 338, 354 (2d Cir. 2017)).

Plaintiff first argues that because Defendants have not moved to dismiss the § 1983 civil conspiracy claim against Nestor, Nestor should not be dismissed as a defendant. (Pl. Opp. at 21-22.) Second, Plaintiff argues that the fabrication claim against Nestor should go forward because: a) there is no legal requirement in the Second Circuit that an individual be acting squarely as an "investigator" to be exposed to fabrication liability and b) when a police officer creates false information likely to influence a jury's decision and forwards it to prosecutors, he violates the accused's constitutional right to a fair trial and invites liability and exposure to damages; and c) Nestor's conduct was squarely investigatory, and fabrication claims may proceed against *any* government official who fabricates evidence and forwards it to the prosecution. (*Id.*) On each argument, the Court agrees with Plaintiff.

First and foremost, the Court will not dismiss Nestor entirely as Defendants have not contested the § 1983 civil conspiracy claim asserted against him. Second, as Plaintiff's correctly note, Defendants misconstrue the requirements for a fabrication claim, as the Second Circuit does

not require that an officer strictly be an "investigating officer" to be held liable. Rather, in both *Garnett* and *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123 (2d Cir. 1997), the Second Circuit emphasized that "[w]hen[ever] a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages." *Ricciuti*, 124 F.3d at 130; *Garnett*, 838 F.3d at 276.

Indeed, in *Garnett*, the Second Circuit quoted *Ricciuti* for its guiding principle on the relevance of fabrication claims.

> No arrest, no matter how lawful or objectively reasonable, gives an arresting officer or his fellow officers license to deliberately manufacture false evidence against an arrestee. To hold that police officers, having lawfully arrested a suspect, are then free to fabricate false confessions at will, would make a mockery of the notion that Americans enjoy the protection of due process of the law and fundamental justice. Like a prosecutor's knowing use of false evidence to obtain a tainted conviction, a police officer's fabrication and forwarding to prosecutors of known false evidence works an unacceptable corruption of the truth-seeking function of the trial process.

*Ricuiti*, 124 F.3d at 130.

Further, as for the four factors that Defendants claim need to be satisfied under *Garnett*, when the Second Circuit assessed these factors in *Garnett*, it explained that they derived from *Jovanovic v. City of New York* (which it noted was a "non-precedential summary order"). In *Garnett*, the Court found that the defendants' reliance on those factors was misplaced as:

> …the cited language is not the holding of the case, which neither purports to decide any new point of law nor claims to constrict or revise the holding of *Ricciuti*. The recitation of elements is simply a restatement of the holdings of prior cases. Second that formulation is in fact derived from the following language in *Ricciuti*: "When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983."

Here, Defendants cite the same four factors that the Second Circuit found to not be the dispositive test for fabrication claims. The Second Circuit was loud and clear in both *Garnett* and *Ricciuti* that when police officers fabricate and submit evidence to prosecutors, they invite the precise type of liability that Plaintiff asserts here, and therefore, they do not enjoy qualified immunity. *Ricciuti,* 124 F.3d at 130 ("These defendant police officers are not entitled to summary judgment on the ground of qualified immunity. Qualified immunity is unavailable where, as here, the action violates an accused's clearly established constitutional rights, and no reasonably competent police officer could believe otherwise.") (citation omitted).

Further, Defendants' reliance on *Dufort v. City of New York*, 874 F.3d 338, 355 (2d Cir. 2017) for the notion that Plaintiff's fabrication and due process right is limited to a very narrow occurrence of when "a government officer act[s] in an investigatory capacity" is misplaced. The Second Circuit in *Dufort* did not uphold the dismissal of plaintiff's due process claims because the government's officers were not acting in a sufficiently investigatory role; rather, it upheld dismissal of those claims because the district court, in assessing a motion for summary judgment, determined that there was insufficient evidence showing that exculpatory evidence was, in fact, ever withheld or misrepresented at trial. The outcome very much hinged on the procedural posture.

There can be no doubt, however, that the right at issue there is the right at issue here. The Court stated: "[t]he constitutional right on which Dufort's § 1983 due process claim rests is the right to have one's case tried based on an accurate evidentiary record that has not been manipulated by the prosecution" and "[t]he "central objective of [§ 1983] ... is to ensure that individuals whose federal constitutional or statutory rights are abridged may recover damages or secure injunctive relief." *Id.* As Plaintiff notes, numerous federal courts throughout the nation have allowed fabrication claims to proceed against any government official—not just investigating officers—

who fabricate evidence and forward it to the prosecution. (*See* Pl. Opp. at 22) (citing *Ying Li v. City of New York*, 246 F. Supp. 3d at 629; *Gregory v. City of Louisville*, 444 F.3d 725, 740 (6th Cir. 2006); *Pierce v. Gilchrist*, 359 F.3d 1279, 1301 (10th Cir. 2004); *Brown v. Miller*, 519 F.3d 231, 237 (5th Cir. 2008); *Johnson v. Han*, No. CV 14-CV-13274-IT, 2015 WL 4397360, at *8 (D. Mass. July 17, 2015)). In sum, the Court finds that Plaintiff has appropriately and plausibly pleaded his fabrication claim against Nestor, and Defendants' Motion to Dismiss this claim is DENIED.

## V. Failure to Investigate Claim Under Due Process Clause

Plaintiff also alleges that Defendants' failure to conduct an adequate investigation violated Plaintiff's right to due process. (*See Compl*. ¶ 222) ("Defendants deprived DiPippo of his right to a fair trial by deliberately failing to conduct a constitutionally adequate investigation, including without limitation by failing to investigate leads pointing towards other suspects and corroborating DiPippo's innocence and by failing to provide information to the Carmel Police Department.") Specifically, Plaintiff claims the failure to investigate exists because:

- Defendants deliberately fabricated false inculpatory evidence and using coercion and/or undue suggestion to obtain inculpatory witness statements, including fabricating the false statements of Rose, Wilson, MacGregor, and Krivak. Defendants also concealed the misconduct that had produced those statements, including coercive and suggestive tactics used in witness interviews. (*Id*. ¶ 219)

- Defendants withheld material exculpatory and impeachment evidence from prosecutors and defense, including exculpatory statements of alleged witnesses prior to their coerced, false statements. (*Id*. ¶ 220)

- Defendants' fabrications and withholding of material, exculpatory, and impeachment evidence undermined confidence in the verdict against DiPippo and deprived DiPippo of a fair criminal trial. (*Id*. ¶ 221)

Defendants claim that Plaintiff's claim fails as a matter of law because "[a] failure to investigate claim does not lie in the due process clause and there is no constitutionally protected right to an adequate investigation." (*See* Def. Mem. at 12) (citing *Newton v. City of New York*, 566

F. Supp. 2d 256, 278 (S.D.N.Y. 2008). Hence, they argue, this claim should be dismissed against all defendants. (Def. Mem. at 12.) Plaintiff has not challenged this argument.

The Court agrees with Defendants. In *Newton*, another wrongful conviction case, this Court explained that there is no constitutional right to an adequate investigation. *Newton*, 566 F. Supp. 2d at 278. Hence, the *Newton* court explained, even accepting the Plaintiff's allegations as true, the rights that were violated invited a claim for malicious prosecution, not a due process violation. *Id. See also McCaffrey v. City of New York*, No. 11 CIV. 1636 RJS, 2013 WL 494025, at *5 (S.D.N.Y. Feb. 7, 2013) ("…while a 'failure to investigate' is not independently cognizable as a stand-alone claim, the Court will address the allegation to the extent that it is relevant to Plaintiff's malicious prosecution and fair trial claims."); *Curanaj v. Cordone*, No. 10-CV-5689 ER, 2012 WL 4221042, at *17 (S.D.N.Y. Sept. 19, 2012) ("there simply is no requirement that police authorities take any action when presented with a complaint."); *Brunette v. City of Burlington, Vermont*, No. 2:15-CV-00061, 2018 WL 4146598, at *7, n.6 (D. Vt. Aug. 30, 2018) ("Courts in the Second Circuit, however, have consistently noted that a failure to investigate is not independently cognizable as a stand-alone claim") (internal quotation marks omitted).

Accordingly, Plaintiff's second cause of action is dismissed under the due process clause, but the allegations still support Plaintiff's claims for malicious prosecution, false arrest, and false imprisonment. *See Blake v. Race,* 487 F.Supp.2d 187, 212 n. 18 (E.D.N.Y.2007) (rejecting independent "failure to investigate" claim while recognizing that allegations connected with such a claim are "properly regarded as part of plaintiffs false arrest and malicious prosecution claims"); *Campbell v. Giuliani,* No. 99 Civ. 2603, 2000 WL 194815, at *3 n. 6 (E.D.N.Y. Feb. 16, 2000) ("[I]n the context of § 1983, allegations of officers' failure to investigate are considered under the rubric of false imprisonment, false arrest, or malicious prosecution.").

## VI.  Intentional Infliction of Emotional Distress Claim Against Putnam

Defendants argue that Plaintiff's intentional infliction of emotional distress claim against Putnam must be dismissed because "public policy bars claims for intentional infliction of emotional distress against a governmental entity." (Def. Mem. at 12) (citing *Eckardt v. City of White Plains*, 87 A.D.3d 1049, 930 N.Y.S.2d 22 (2011); *Shahid v. City of New York*, 144 A.D.3d 1127, 43 N.Y.S.3d 88 (N.Y. App. Div. 2016)). Plaintiff does not oppose this claim.

The Court has reviewed the law and finds Defendants to be correct. New York public policy bars claims sounding in intentional infliction of emotion distress against governmental entities. *See Echardt*, 87 A.D.3d at 1051; *Shahid*, 144 A.D.3d at 1129. Accordingly, Plaintiff's claim for intentional infliction of emotional distress against Putnam is DENIED with prejudice.

## CONCLUSION

For the foregoing reasons, Defendants' Motion is GRANTED in part and DENIED in part.

Defendants' Motion is DENIED insofar as: Plaintiff's fabrication claim against Nestor, Plaintiff's various theories of *Monell* liability against Putnam, and Plaintiff's Supervisory Liability claims against Sheriff Thouborron.

Defendants' Motion is GRANTED, with prejudice, insofar as the intentional infliction of emotional distress claim against Putnam and failure to investigate claims predicated on the due process clause. It is GRANTED without prejudice insofar as Plaintiff's failure to intervene claims.

The Clerk of the Court is respectfully directed to terminate the motion at ECF No. 28. The parties are directed to inform Magistrate Judge Judith C. McCarthy of the Court's decision.


Dated: February 28, 2019                                      SO ORDERED:
White Plains, New York

                                                      _____
                                                      NELSON S. ROMÁN
                                                      United States District Judge